UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION
CIVIL ACTION NUMBER 2:19-CV-00103- JRG-CRW

| | |
|---|---|
| JEREMIAH WALDROP and PHILLIP SELF, as individuals,<br><br>Plaintiffs,<br><br>- against -<br><br>CITY OF JOHNSON CITY, TENNESSEE,<br><br>Defendant. | **PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL REQUESTED**<br><br>CIVIL RIGHTS ACTION TITLE 42 U.S.C. § 1983<br><br>DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES |

COME NOW Plaintiffs, JEREMIAH WALDROP and PHILLIP SELF, as individuals (hereinafter "Plaintiffs"), by and through their counsel, and as their cause of action against Defendant herein, aver as follows:

**INTRODUCTION**

1. Plaintiffs bring this action seeking declaratory relief, injunctive relief, and damages to redress deprivations by the CITY OF JOHNSON CITY, TENNESSEE ("City/Defendant").

2. On September 15, 2018, the City's officers, agents, and employees threatened to arrest Plaintiffs pursuant to the City's "Special Event Policy, Procedure and Application" (the "Policy"), and the practices and customs approved by the City for interpreting, enforcing, and applying the City's Policy. Plaintiffs challenge the manner in which the Policy was interpreted, enforced, and applied against them pursuant to the training, policies, and practices used by the CITY OF JOHNSON CITY, TENNESSEE. The CITY OF JOHNSON CITY, TENNESSEE,

trains its officers, agents, and employees to interpret, enforce, and apply the Policy and further provided instruction to its officers regarding removing individuals from the September 15, 2018, Special Event that was non-exclusive, that was not ticketed, that was free and open to the public, and was conducted on public property. Plaintiffs challenge the City's policy, practice, or custom for training its officers, agents, and employees to interpret, enforce, and apply the Policy, and alleges that the training and/or instruction is either erroneous or lacking in proper instruction to avoid violations of Plaintiffs' constitutional rights.

3. This action challenges the CITY OF JOHNSON CITY, TENNESSEE's Policy and the practice and/or custom for training (or lack of training for) its officers, agents, and employees to interpret, enforce, and apply (as-applied challenge) the Policy, and the practices and customs approved by the City for interpreting, enforcing, and applying the City's Policy on September 15, 2018.

4. This action challenges the interpretation and enforcement (as-applied challenge) of the City's Policy against Plaintiffs on September 15, 2018, and seeks injunctive relief to prevent future enforcement of the Policy and the practices and customs approved by the City for interpreting, enforcing, and applying the City's Policy on September 15, 2018.

## PARTIES

5. Plaintiff, JEREMIAH WALDROP, is an adult and brings this action in his personal capacity.

6. Plaintiff, PHILLIP SELF, is an adult and brings this action in his personal capacity.

7. Defendant, CITY OF JOHNSON CITY, TENNESSEE, is a body politic and corporate located within the State of Tennessee and has the ability to sue and be sued. The City has the right, power, privilege, and authority to adopt and enforce the Policy. The City has the right, power, privilege, and authority to train (or fail to properly train) its officers, agents, and employees to interpret, enforce, and apply the Policy and other regulations and to do and perform all of the acts pertaining to its local affairs. At all material times, the City acted toward Plaintiffs under color of the statutes, ordinances, customs, and usage of the City. At all material times, the City was the employer of the City's police officers, including but not limited to Lieutenant Peters, Sergeant Hodges, Thomas Dillard, Sergeant Sparks, Sergeant Shepard, and other unknown officers acting to interpret, enforce, and apply the Policy against Plaintiffs, and is responsible for the training (or lack thereof), related to the policies, practices, and customs of the City's Police Department. The City knew of the unlawful enforcement of the City's Policy alleged herein, and had the power and authority to remedy the unlawful interpretation, enforcement, and application, but failed to do so. The City, by both its acts and failure to act, has ratified the unlawful interpretation, enforcement, and application of the Policy. The City's on-going vigorous defense of the unlawful interpretation, enforcement, and application, on September 15, 2018, reveals the City intends to continue the same unlawful interpretation, enforcement, and application into the future absent this Court's intervention.

## JURISDICTION AND VENUE

8. Plaintiffs bring this action seeking injunctive relief and nominal and/or compensatory and/or special and/or exemplary damages to redress deprivations by the City,

acting under color of state law, of certain rights secured to Plaintiffs and others as alleged herein under the United States Constitution as brought pursuant to 42 U.S.C. § 1983.

9. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4), which provide for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. § 1983.

10. Jurisdiction is also conferred on this Court by 28 U.S.C. § 1331 because the cause of action arises under the Constitution and laws of the United States.

11. This Court has supplemental subject-matter jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a) in that the state law claims form part of the same case or controversy as the federal claims.

12. This Court is authorized to grant Declaratory Judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, implemented through Rule 57 of the Federal Rules of Civil Procedure, and under Tennessee's Religious Freedom Restoration Act of 2009, Title 4, Chapter 21, Part 11, C.A. § 4-21-1101, and to issue the Preliminary and Permanent Injunctive relief requested by Plaintiffs under Rule 65 of the Federal Rules of Civil Procedure.

13. This Court is authorized to grant Plaintiffs' prayer for relief and to award Plaintiffs' costs in this action for violations of Plaintiffs' constitutional and civil rights, including a reasonable attorneys' fee, pursuant to 42 U.S.C. § 1983; 42 U.S.C. § 1988; Tennessee's Religious Freedom Restoration Act of 2009, Title 4, Chapter 21, Part 11, C.A. § 4-21-1101; Rule 54 of the Federal Rules of Civil Procedure; and 28 U.S.C. § 1920.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the City resides and/or does business in the Eastern District of Tennessee and may be found and served in the Eastern District of Tennessee.

15. Venue is proper in the Eastern District of Tennessee as all of the events giving rise to the claims herein occurred in this District.

## **FACTS**

16. Plaintiffs are individuals acting to spread awareness of their views regarding religious, political, and social topics.

17. Among Plaintiffs' purposes is the belief in a mandate to exercise their rights to freedom of speech and the free exercise of religion, and to further their religious, political, and social beliefs.

18. Plaintiffs bring this action to vindicate and protect their rights to Freedom of Speech, Freedom of Assembly, the Free Exercise of Religion, Due Process, the Equal Protection of the Laws, and their rights under Tennessee's Religious Freedom Restoration Act of 2009, Title 4, Chapter 21, Part 11, C.A. § 4-21-1101, in the City by ensuring that the City is restrained from acting prospectively in violation of those rights.

19. The public parks, public streets, public sidewalks, and public rights-of-way within the jurisdiction of the City ("Public Spaces") are traditional public fora.

20. Plaintiffs, citizens, and members of the public utilize the Public Spaces for various activities, including communication and the exchange of ideas.

**Plaintiffs' Planned Activities**

21. Plaintiffs have shared their religious, political, and social speech with people in the City.

22. Plaintiffs' message is one of hope and salvation that Christianity offers.

23. Plaintiffs have not harassed, encouraged violence, or expressed themselves in any way other than in a peaceful manner.

24. Plaintiffs desire to continue their peaceful activities without being incarcerated or cited.

25. Plaintiffs share their faith in various ways.

26. Plaintiffs distribute free literature and carry portable signs.

27. Plaintiffs record public events for commentary and distribution.

28. Plaintiffs engage others in respectful, one-on-one discussions about Jesus Christ and the Christian faith.

29. Plaintiffs have a religious mandate to go to Public Spaces in the City.

30. On upcoming days – including but not limited to days in August 2020 through December 2023 – Plaintiffs have concrete plans to engage in their constitutionally-protected activities by peacefully expressing religious, political, and social speech within the City's Public Spaces.

31. As a direct and proximate result of the City's prior enforcement of the Policy, Plaintiffs are unsure of their ability to exercise their constitutionally-protected activities, and fear arrest and incarceration.

**The City Adopts the Policy**

32. The City adopted the Policy titled "Special Event Policy, Procedure and Application."

33. The Policy states in part: "A Special Event Permit is approved and issued for street closure requests and road block requests in relation to an organized special event."

34. The Policy defines a "Special Event" as: "Any organized street festival, commercial block party, road race, parade, or fundraiser road block that is open to the public, whether a ticketed event or a non-ticketed event, held wholly or partially on City owned or maintained property."

35. The Policy states in part: "It is the goal of the Special Event Review Committee to assist event organizers in planning safe and successful events that create a minimal impact on the communities surrounding the events. . . . The Committee will review all upcoming events held in the City of Johnson City."

36. The Policy states in part:

> Reservations for events held in Founders Park, the Amphitheater at Founders Park, the Pavilion at Founders Park and King Commons must be made by submitting a fully completed Founders Park Reservation Request. . . . Additional instructions will be provided by the [Johnson City Development] authority's coordinator based on the nature of the event. . . .
>
> Organizers requesting a street closure associated with an event held in a City park or in Founders Park, etc., must submit a separate Special Event Permit application no less than ninety (90) days prior to the date of the event.

**The City's Pattern and Practice of Violating Plaintiffs' Constitutional Rights**

37. On September 7, 2014, Plaintiff WALDROP and others were peacefully sharing their religious message outside Rotary Park on a public sidewalk within the City during a Pride event.

38. At approximately 2:35 p.m., four police officers arrived on scene.

39. The City's officer, Sgt. Van Mominee, stated that the activity was illegal because it was creating a disturbance.

40. While Sgt. Mominee was speaking with Plaintiff WALDROP, an associate began to speak.

41. Sgt. Mominee stated that no person was allowed to speak in the direction of the event within Rotary Park because it would automatically be considered a disturbance. After being asked to clarify the legal definition of "disturbance," Sgt. Mominee replied that if any person speaking caused anyone at the event to turn and look in the direction of the speaker, "You've created a disturbance."

42. Sgt. Mominee further warned that Plaintiff WALDROP and his associates would be issued a citation if they continued to speak.

43. Sgt. Mominee then left and later returned with the director of the event. The director of the event had decided that Plaintiff WALDROP and his associates would be allowed to speak in their direction if they used only their casual voices. Plaintiff WALDROP asked Sgt. Mominee to clarify their right to speak. Sgt. Mominee refused to clarify and walked away.

44. After about 10 minutes, Plaintiff WALDROP and his associates left.

45. In an attempt to amicably resolve this issue, on October 15, 2014, Plaintiff WALDROP sent an email to Chief of Police Sirois, notifying him of the situation and asking if Plaintiff WALDROP's rights would be upheld in the future.

46. Chief Sirois replied that he would look into the issue, but never replied with any conclusion of the matter.

47. On August 27, 2015, counsel for Plaintiff WALDROP sent a letter to the City, notifying the City of Plaintiff WALDROP's intention to peacefully share his religious message at the upcoming Pride event at Rotary Park, and requesting a conference call to discuss the issues in light of the constitutional violations of September 7, 2014.

48. On September 3, 2015, outside counsel for the City responded, rejecting the request for a conference call, and directing counsel for Plaintiff WALDROP to inform Plaintiff WALDROP of cases relating to time, place, and manner restrictions on speech, and governments' interest in maintaining the peace.

49. During the June 23, 2020, deposition of Chief Sirois, he reviewed the video evidence of the City's officers' interactions with Plaintiff WALDROP and his associates outside Rotary Park on September 7, 2014. During the deposition, he testified that he approved of the manner in which the City's officers interpreted, enforced and applied the City's policies, practices and procedures. During the deposition, he testified he did not believe the City's officers required any additional instruction and/or training because he believed they acted correctly.

**The September 15, 2018, Special Event**

50.     In 2018, TRIPRIDE submitted an application requesting a street closure to conduct a parade on public streets in the City on September 15, 2018 ("Parade").

51.     The City granted TRIPRIDE's application for the parade.

52.     In 2018, TRIPRIDE submitted an application requesting to use Founder's Park for a Festival on September 15, 2018 ("Festival").

53.     The City granted TRIPRIDE's application for the Festival.

54.     On September 15, 2018, the Festival was held in the City.

55.     On September 15, 2018, the Festival was free to the public.

56.     On September 15, 2018, the Festival was open to the public.

57.     On September 15, 2018, the Festival was not ticketed.

58.     On September 15, 2018, the Festival was located on public streets and sidewalks and in a public park.

59.     On September 15, 2018, the Festival was located on public streets and sidewalks and in a public park open to pedestrians.

60.     During the June 25, 2020, deposition of the City's "Administrative Coordinator" for Special Events (in 2018), Ms. Sheri Keenan, she testified the Festival permit issued to TRIPRIDE was "non-exclusive."

61.     During Ms. Keenan's deposition on June 25, 2020, she testified that a "non-exclusive" permit was issued when all the public was invited to attend.

62.     During Ms. Keenan's deposition on June 25, 2020, she testified that a "non-exclusive" permit was issued when tickets were not required.

**The City allows TRIPRIDE to control access into the Special Event for security**

63. During the 30(b)(6) deposition of TRIPRIDE's representative on July 14, 2020, the witness testified that during meetings with the City's Attorney, Mr. Epps, the City's Attorney stated the First Amendment prevented TRIPRIDE from excluding anyone from the Festival based upon the message being contrary to TRIPRIDE's message.

> Q. When you were in any of the meetings with the City -- you recall we discussed on July 1st that there were meetings with the City attorney being present as well?
> A. Yes.
> Q. Do you remember, did they bring up any particular memoranda of law? Or did they mention any cases like, We believe that we have the legal authority to do what we're doing as far as controlling access because some case tells us this or we received a memorandum on this?
> A. I don't remember any discussion about legal memorandums as far as access.
> Is that what you're talking about, as far as access to the event?
> Q. About TriPride controlling access to the festival.
> A. No. He did make a point that this -- you know, that -- like we already discussed on July 1st, that TriPride had the right to ask people to leave if they were being disruptive, threatening to our attendees or our people participating -- people putting on the event themself.
> But beyond that, that, you know, everybody had the right to be there.
> Q. All right. Do you remember when you said "he," do you mean the City attorney --
> A. The City attorney, yes.
> Q. Okay. Do you remember his name? Is it Mr. Epps?
> A. Mr. Epps.
> Q. Okay. Good enough.
> And I know there were more than one meeting, but I believe there was one particular meeting

where there was a decision made as to doing the controlling access part to the festival area.
Do you remember any other meetings in that regard as far as controlling access to the festival area you had with the City and with the City attorney?
A. I believe it was reiterated at meetings. You know, other meetings, the same point that had been brought up, but just again reiterating that point.
Q. Okay. The one you just mentioned a moment ago?
A. Yes.
Q. Okay. But there was no addition as far as saying something like: We've now done this research; here's our legal authority for this; this case tells us we can do this? You don't remember any discussion like that?
A. There was discussion about, again, First Amendment rights of all individuals, and that we were expressing our First Amendment rights by having the event and that other people had the right to disagree with this. And that was -- led into the idea of the protestors having a designated area inside the festival grounds.
Q. Okay. And do you remember that -- in any of the subsequent meetings or near the end of the time of the meetings, but then the festival is about to start, that people with divergent viewpoints could, in fact, be in the festival area as well?
A. Yes. As long as they weren't being disruptive, or harassing, or threatening our attendees.
Q. Okay. Was that said by the City attorney's office; do you remember?
A. It was.

Deposition of TriPride on 071420, p. 4, line 7 - p. 6, line 25.

64. During the City's 30(b)(6) deposition on June 26, 2020, the City's witness, Captain Brian Rice, testified the *only* reason the City gave TRIPRIDE control was security.

Q. Persons with various expressive messages could walk throughout the event area, correct?

A. Yes, sir.
Q. Persons with expressive messages could express those messages in Founders Park, correct?
A. Yes. I suppose so, yes, sir.
Q. Okay. So did the City limit the expressive messages of anyone?
A. No. And again, the expressive messages was not really even a thought going into this. It was based on security.

Deposition of Brian Rice as City's 30(b)(6) witness on 062620, p. 34, lines 10-20.

65. During the City's 30(b)(6) deposition on June 26, 2020, the City's witness, Captain Brian Rice, testified the City's Police Department would not comply with a request from TRIPRIDE to remove someone based on their expressive message. Deposition of Brian Rice as City's 30(b)(6) witness on 062620, p. 35, lines 15-19.

66. During the City's 30(b)(6) deposition on June 26, 2020, the City's witness, Captain Brian Rice, testified that no one would be removed unless they were a security threat. Deposition of Brian Rice as City's 30(b)(6) witness on 062620, p. 32, lines 10-24.

**TRIPRIDE claims the City allowed it to regulate "hate speech" at the Special Event**

67. TRIPRIDE's President testified "hate speech" could be a reason TRIPRIDE would demand someone be removed on September 15, 2018.

68. TRIPRIDE's President testified "hate speech" could have many different interpretations for many different people.

69. TRIPRIDE's President testified "hate speech" would be interpreted differently by him as compared to other TRIPRIDE representatives present on September 15, 2018, and each person could decide whether to demand someone be removed.

70. TRIPRIDE's President testified an example of "hate speech" he witnessed on September 15, 2018, was some "preachers" on a sidewalk inside the Festival area displaying a sign stating "God Hates Fags."

71. On September 15, 2018, Plaintiffs did not carry or display any signs inside the Festival area.

72. TRIPRIDE's President testified he witnessed a "heated" exchange inside Founder's Park during the Festival on September 15, 2018, between two people with opposite viewpoints, but did not request anyone be removed because the individuals were simply expressing their distinct positions on LGBT issues.

Q. These individuals that you say were outside
the Founder -- the festival -- you say that -- would
they have been allowed to go into the festival area?
A. Not doing what they were doing.
Q. Not doing what they were doing.
What could they do if they went in there?
A. They could have civil conversations with
people without going through the majority of the
name-calling, belittling, harassment; if they had
just civil discussions. And if they disagreed on
their viewpoints, that would be fine.
Q. Okay.
A. In fact, I had an experience where that -- at
the event where that happened.
Q. That did happen?
A. It did.
Q. Okay. And that person was allowed to express
their viewpoint.
Was it against LGBT or –
A. That's correct.
Q. Do you know who that person was?
A. I don't.
Q. Okay. But somebody, during the event that
day did that?
A. Yes. I witnessed that.
Q. You witnessed it.

And did anyone with TriPride ask for them to be removed?

A. No. I was the person that was called to the area. And when I got there, it was this one gentleman. The discussion with the gentleman was heated, but there was no name calling. It was respectful dialogue back and forth. The police actually asked me if I wanted him to be removed, and I said no. He was not being disruptive in my opinion. They were just expressing different viewpoints. And so he stayed in the festival.

Deposition of Kenn Lyon on 070120, p. 4, line 7 - p. 5, line 19.

**The City establishes security at the Special Event**

73. Captain Brian Rice was the City's Incident Commander for the Special Event on September 15, 2018.

74. During Captain Brian Rice's deposition, he clarified the Parade and Festival were typically referred to in the larger geographic area as the TRIPRIDE "event" area. The Parade and Festival were both conducted in the "event" area. After the Parade concluded, the "event" area was reduced in size and some of the streets that had been closed under the Parade permit were opened to vehicular traffic. The reduced "event" area then became the "Festival" area, which included Founder's Park, the nearby Pavilion, and the streets and sidewalks inside the "Festival" area which remained open to all pedestrians on September 15, 2018.

75. The City managed all the security for the TRIPRIDE "event" area (encompassing the Parade and Festival) on September 15, 2018.

76. Other non-City law enforcement agencies were utilized for security, under the supervision of the City, for the TRIPRIDE "event" area on September 15, 2018.

77. The City created entry points for the "event" area so that all persons would be screened and bags would be checked prior to entering the "event" area.

78. The City did not establish any additional security screening prior to persons entering the Festival area and/or Founder's Park.

**The City trains for security at the Special Event**

79. The City improperly instructed officers, prior to the beginning of the Festival on September 15, 2018, that TRIPRIDE had the authority to exclude whomever it chose from the Festival area, including Founder's Park.

80. The City failed to properly train and/or instruct officers, prior to the beginning of the Festival on September 15, 2018, that TRIPRIDE had the authority to exclude people from the Festival area only if the person was a security threat.

81. The City failed to properly train and/or instruct officers, prior to the beginning of the Festival on September 15, 2018, that TRIPRIDE did not have the authority to exclude people from the Festival area for the reason a person was expressing a message contrary to TRIPRIDE's message.

82. On September 15, 2018, pursuant to the City's security plan, TRIPRIDE was to assign one or more TRIPRIDE employees at the security checkpoints set up by the City at the perimeter of the "event" area.

83. On September 15, 2018, TRIPRIDE did not post any employee(s) at the security checkpoints set up by the City at the perimeter of the "event" area.

**Defendant Threatens to Arrest Plaintiffs Under the Policy**

84. On September 15, 2018, Plaintiffs passed through the City's security checkpoint in order to enter the public park, public sidewalks and public streets that were open to the public.

85. On September 15, 2018, Plaintiffs were exercising their constitutional rights to freedom of speech and free exercise of religion by peacefully sharing their Christian message.

86. On September 15, 2018, Plaintiffs were exercising their constitutional rights to freedom of speech and free exercise of religion by peacefully sharing their Christian message while on a public sidewalk and while in a public park in the City.

87. On September 15, 2018, the public sidewalk and public park where Plaintiffs were located were open to the public.

88. On September 15, 2018, Plaintiffs were not being disruptive, harassing, or threatening to any person.

89. On September 15, 2018, Plaintiffs did not interfere with the Festival, any Festival-related activity, or any person's ability to participate in or enjoy the Festival or any Festival-related activity.

90. During Captain Brian Rice's deposition on June 25, 2020, he testified that none of the Plaintiffs had interfered with the Parade or the Festival.

91. On September 15, 2018, Plaintiffs attempted to peacefully discuss their message one-on-one within Founder's Park.

92. On September 15, 2018, Plaintiffs attempted to peacefully walk through Founder's Park sharing their message one-on-one with others.

93.     On September 15, 2018, Plaintiffs did not use any amplification while peacefully attempting to walk through Founder's Park sharing their message one-on-one with others.

94.     On September 15, 2018, the City's officers directed the Plaintiffs to leave Founder's Park while Plaintiffs were peacefully attempting to walk through Founder's Park sharing their message one-on-one with others.

95.     On September 15, 2018, the City's officers removed the Plaintiffs from Founder's Park while Plaintiffs were peacefully attempting to walk through Founder's Park sharing their message one-on-one with others.

96.     On September 15, 2018, the City's officers removed the Plaintiffs from Founder's Park while Plaintiffs were peacefully attempting to walk through Founder's Park sharing their message one-on-one with others and the City's officers stated that Plaintiffs could not reenter Founder's Park during the Festival.

97.     On September 15, 2018, the City's officers removed the Plaintiffs from Founder's Park while Plaintiffs were peacefully attempting to walk through Founder's Park sharing their message one-on-one with others and the City's officer stated that Plaintiffs could not move from the location on the sidewalk outside Founder's Park they had been directed to remain during the Festival.

98.     On September 15, 2018, the City's officer, Lieutenant Peters, told Plaintiffs that if they reentered Founder's Park the Festival organizers "would tell us that they don't want you there, you would be asked to leave; once you left you're fine; if you went back in then you could be cited."

99. On September 15, 2018, the City's officer, Lieutenant Peters, told Plaintiffs "y'all have already been told you're not welcomed over there . . . so, you can't go over there."

100. On September 15, 2018, the City's officer, Lieutenant Peters, told Plaintiffs "you will be arrested if you go over there."

101. On September 15, 2018, the City's officer, Lieutenant Peters, stated Plaintiffs were required to move outside of Founder's Park.

102. On September 15, 2018, the City's officer, Thomas Dillard, told Plaintiffs: "Back up, on the sidewalk. They got this rented."

103. On September 15, 2018, the City's officer, Sergeant Sparks, told Plaintiffs "on this side of the sidewalk has [sic] been rented by a private company."

104. On September 15, 2018, the City's officer, Sergeant Sparks, told Plaintiffs "So now they want you out of their park."

105. On September 15, 2018, the City's officer, Sergeant Sparks, told Plaintiffs that the Festival organizers' permit allowed them to decide who they did not want in the Festival.

106. On September 15, 2018, the City's officer, Sergeant Shepard, told Plaintiffs "you guys have already been warned not to be back on the property."

107. On September 15, 2018, the City's officer, Sergeant Shepard, referred to Founder's Park as "their property," referring to the Festival organizers.

108. On September 15, 2018, the City's officer, Sergeant Hodges, told Plaintiffs that they could not stand on the sidewalk outside the "event" area because the "event" area was "designated for" the Festival organizers.

109. On September 15, 2018, the City's officer, Sergeant Hodges, told Plaintiffs they could not bring their signs into the "event" area.

110. The City's Incident Commander for the Special Event on September 15, 2018, was Capitan Brian Rice.

111. In his position of deployment on September 15, 2018, Capitan Brian Rice had supervisory decision-making authority on the scene for the City.

112. In his position of deployment on September 15, 2018, Capitan Brian Rice had supervisory decision-making authority on the scene for the City for interpreting and enforcing the Policy and the City's policies, practices, and procedures against Plaintiffs.

113. In his position of deployment on September 15, 2018, a TRIPRIDE representative requested that the City's officers remove Plaintiffs from the public sidewalk outside Founder's Park where the City's officer had previously directed Plaintiffs to remain after being removed from Founder's Park. Capitan Brian Rice denied TRIPRIDE's request because he determined Plaintiffs were not disrupting the Festival.

114. On September 15, 2018, the City's officers, agents, and employees threatened to arrest Plaintiffs pursuant to the policies, practices, and customs adopted and approved by the City to train its officers, agents, and employees for interpreting, enforcing, and applying the Policy, and conducted themselves pursuant to the training provided by the City.

115. On September 15, 2018, the City's officers, agents, and employees threatened to arrest Plaintiffs based upon the Special Event permit granted to TRIPRIDE by the City.

116. On September 15, 2018, the City was aware that Plaintiffs could no longer engage in Plaintiffs' freedom of speech and free exercise of religion at that time and location if Plaintiffs were placed under arrest.

117. On September 15, 2018, the City was aware that the known and obvious consequence of the actions of enforcing the Policy on September 15, 2018, would silence Plaintiffs' freedom of speech and free exercise of religion.

118. As a direct and proximate result of the threats of arrest and enforcement of the Policy pursuant to the policies, practices, and customs adopted and approved by the City, Plaintiffs forfeited their constitutionally-protected activities due to fear of arrest and incarceration.

**Plaintiffs' Attempt to Avoid Litigation**

119. On October 8, 2018, counsel for Plaintiffs sent a letter to the City to avoid litigation and reach an amicable resolution of the issues.

120. The City has never responded to that letter.

**GENERAL ALLEGATIONS**

121. The City and/or its agents, in concert with others, knowingly, willfully, and intentionally acted to prohibit Plaintiffs from engaging in constitutionally-protected conduct in a traditional public forum.

122. As a direct and proximate result of the prior enforcement of the Policy, and the City's policy, practice, or procedure, Plaintiffs are forfeiting their constitutionally-protected activities due to fear of arrest, incarceration, and fines.

123.    As a direct and proximate result of the enforcement of the Policy, and the City's policy, practice, or procedure, on September 15, 2018, Plaintiffs were unconstitutionally denied the right to exercise their freedom of speech.

124.    As a direct and proximate result of the enforcement of the Policy, and the City's policy, practice, or procedure, on September 15, 2018, Plaintiffs were unconstitutionally denied the right to the free exercise of their religion.

125.    As a direct and proximate result of the enforcement of the Policy, and the City's policy, practice, or procedure, on September 15, 2018, Plaintiffs were unconstitutionally denied the right to due process.

126.    As a direct and proximate result of the enforcement of the Policy, and the City's policy, practice, or procedure, on September 15, 2018, Plaintiffs were unconstitutionally denied the right to the equal protection of the laws.

127.    As a direct and proximate result of the enforcement of the Policy, and the City's policy, practice, or procedure, on September 15, 2018, Plaintiffs were threatened with citation.

128.    As a direct and proximate result of the enforcement of the Policy, and the City's policy, practice, or procedure, on September 15, 2018, Plaintiffs were threatened with arrest.

129.    As a direct and proximate result of the enforcement of the Policy, and the City's policy, practice, or procedure, on September 15, 2018, Plaintiffs were publicly humiliated.

130.    As a direct and proximate result of the enforcement of the Policy, and the City's policy, practice, or procedure, on September 15, 2018, Plaintiffs were publicly embarrassed.

131.    The enforcement of the Policy, and the City's policy, practice, or procedure, and the City's officers', agents', and employees' actions under color of state law on September 15,

2018, have deprived, and continue to deprive, Plaintiffs of their constitutional rights as Plaintiffs are currently chilled in the exercise of those rights.

132.    As a direct and proximate result of the enforcement of the Policy, and the City's policy, practice, or procedure, on September 15, 2018, and the City's officers', agents', and employees' actions under color of state law, Plaintiffs fear future arrest and incarceration when exercising their constitutional rights.

133.    As a direct and proximate result of the enforcement of the Policy, and the City's policy, practice, or procedure, on September 15, 2018, and the City's officers', agents', and employees' actions under color of state law, Plaintiffs are uncertain and unsure of their ability to exercise their constitutional rights.

134.    Plaintiffs have been damaged by the deprivation of their rights guaranteed by the United States Constitution and Tennessee's Religious Freedom Restoration Act of 2009, Title 4, Chapter 21, Part 11, C.A. § 4-21-1101.

135.    As interpreted and enforced, Plaintiffs' manner of expressing their constitutional rights is prohibited by the Policy and the City's policy, practice, or procedure.

136.    Plaintiffs are uncertain whether they will be arrested and incarcerated in the future while attempting to exercise their constitutional rights within the City.

137.    The threat of future arrests and incarceration is both great and immediate.

138.    The future impingement of Plaintiffs' rights is an absolute certainty unless and until this Court grants the injunctive relief requested herein.

139.    Plaintiffs' constitutional rights have been discouraged to the point that Plaintiffs fear arrest and incarceration while exercising their constitutional and civil rights.

140.     Plaintiffs wish to continue exercising their constitutional rights, and have specific and concrete intentions to continue engaging in the exercise of their constitutional rights, including activities prohibited by the Policy and by the City's policy, practice, or procedure, as interpreted and enforced, but they are fearful of being arrested and incarcerated for exercising their constitutional and civil rights.

141.     The violations of Plaintiffs' constitutional rights alleged herein have caused, and will continue to cause, Plaintiffs to suffer extreme hardship, both actual and impending; irreparable injury; and damage.

142.     Plaintiffs currently suffer from the denial of rights guaranteed by the United States Constitution because of the actions taken under color of law.

143.     There is a substantial likelihood that Plaintiffs will prevail on the merits in this case because the enforcement of the Policy, and the City's policy, practice, or procedure, and the actions under color of state law, constitute an abridgement of Plaintiffs' constitutional rights and a violation of Tennessee's Religious Freedom Restoration Act of 2009, Title 4, Chapter 21, Part 11, C.A. § 4-21-1101.

144.     The harm to Plaintiffs outweighs any subjective harm to the City.

145.     The public interest is benefited when constitutional and civil rights are protected by the Courts.

146.     The enforcement of the Policy and the City's customs, policies, and practices, and the actions under color of state law, deprived Plaintiffs of their right to freedom of speech and the free exercise of religion protected under the United States Constitution and Tennessee's Religious Freedom Restoration Act of 2009, Title 4, Chapter 21, Part 11, C.A. § 4-21-1101.

147. The City acted without reasonable cause and without due care in causing the deprivation of Plaintiffs' rights to freedom of speech and the free exercise of religion protected under the United States Constitution and Tennessee's Religious Freedom Restoration Act of 2009, Title 4, Chapter 21, Part 11, C.A. § 4-21-1101.

148. As a direct and proximate result of the actions and omissions under color of state law, Plaintiffs suffered the loss of Plaintiffs' freedom of speech and free exercise of religion protected under the United States Constitution and Tennessee's Religious Freedom Restoration Act of 2009, Title 4, Chapter 21, Part 11, C.A. § 4-21-1101.

149. The City's actions and omissions were performed with malice, or oppression, or callous or deliberate indifference, or a conscious disregard of Plaintiffs' rights to freedom of speech and the free exercise of religion protected under the United States Constitution and Tennessee's Religious Freedom Restoration Act of 2009, Title 4, Chapter 21, Part 11, C.A. § 4-21-1101.

150. The enforcement of the Policy and the City's policy, practice, or procedure, and the City's customs and practices, enforced under color of state law, are the moving force behind the violation of Plaintiffs' rights to freedom of speech and the free exercise of religion protected under the United States Constitution and Tennessee's Religious Freedom Restoration Act of 2009, Title 4, Chapter 21, Part 11, C.A. § 4-21-1101.

151. The enforcement of the Policy and the City's policy, practice, or procedure, and the City's customs and practices, enforced under color of state law, operate to unconstitutionally limit, ban, and censor Plaintiffs' rights to freedom of speech and the free exercise of religion

protected under the United States Constitution and Tennessee's Religious Freedom Restoration Act of 2009, Title 4, Chapter 21, Part 11, C.A. § 4-21-1101.

152.    The City had a duty at all times mentioned herein to implement and enforce policies and procedures to adequately supervise and adequately train officials, agents, and employees so as to prevent the constitutional violations and the violation of Tennessee's Religious Freedom Restoration Act of 2009, Title 4, Chapter 21, Part 11, C.A. § 4-21-1101, as alleged herein.

153.    The City failed to implement and enforce policies and procedures to adequately supervise and adequately train officials, agents, and employees so as to prevent the constitutional violations and the violation of Tennessee's Religious Freedom Restoration Act of 2009, Title 4, Chapter 21, Part 11, C.A. § 4-21-1101, as alleged herein.

154.    The City's actions and omissions regarding the failure to adequately train officials, agents, and employees so as to prevent the constitutional violations alleged herein exhibit deliberate indifference toward Plaintiffs' rights to freedom of speech and the free exercise of religion protected under the United States Constitution and Tennessee's Religious Freedom Restoration Act of 2009, Title 4, Chapter 21, Part 11, C.A. § 4-21-1101.

155.    Plaintiffs have satisfied all conditions precedent to bringing this action.

156.    Plaintiffs are entitled to recover reasonable attorneys' fees and costs from Defendant pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, Fed. R. Civ. P. 54, and 28 U.S.C. § 1920.

**AS AND FOR A FIRST CAUSE OF ACTION:**

**SECTION 1983 – UNCONSTITUTIONAL POLICY AS APPLIED AGAINST DEFENDANT CITY**

**THE POLICY AND DEFENDANT'S ACTIONS VIOLATE THE FREEDOM OF SPEECH CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**

157. The averments of paragraphs 1-156 are repeated and alleged in full force and effect as if repeated in their entirety herein.

158. The First Amendment to the United States Constitution, applied to the States through the Fourteenth Amendment, prohibits unconstitutionally abridging the freedom of speech.

159. As interpreted and enforced by the City, Plaintiffs' manner of freedom of speech is prohibited by the Policy.

160. The City's officers', agents', and/or employees' actions were performed under color of state law in that they claimed to be performing an official duty, but their acts were outside the limits of lawful authority and abusive in manner, and they further acted in a way that misused their power, and were able to do so only because of their positions as City officials.

161. The City's actions were taken with malice or reckless indifference to Plaintiffs' right to freedom of speech.

162. As applied, the Policy unconstitutionally attempts to convert the City's streets, sidewalks, and parks from traditional public fora into a nonpublic forum during Special Events conducted in the City.

163. As applied, the Policy unconstitutionally limits Plaintiffs' freedom of speech by forcing Plaintiffs to move out of a traditional public forum during Special Events.

164.     As applied, the Policy unconstitutionally imposes a burden on Plaintiffs' and other individuals' constitutional rights because it:

a.     allows for the exercise of unbridled discretion; and,

b.     lacks narrow tailoring, fails to achieve any legitimate government purpose, and fails to leave open alternative avenues for expression; and,

c.     bars the free speech of Plaintiffs and possibly other third-party citizens in a traditional public forum.

165.     The Policy as applied impedes Plaintiffs' right to freedom of speech because it denies Plaintiffs' right to freedom of speech and satisfies no rational, substantial, or compelling government interest in the least restrictive means possible.

166.     As applied, the Policy prohibits Plaintiffs' manner of freedom of speech.

167.     Plaintiffs were deprived of their right under the First Amendment to engage in freedom of speech activities prohibited by the Policy as applied.

168.     Plaintiffs have been, and continue to be, deprived of their right under the First Amendment to engage in freedom of speech.

169.     Plaintiffs have suffered injuries and damages as a result of the City's deprivation of their rights, including but not limited to mental and emotional distress, impairment of reputation, personal humiliation, and other tangible and intangible harms that would not exist but for the City's actions and/or omissions, and these harms are reasonably certain to be experienced into the future.

WHEREFORE, Plaintiffs respectfully request that this Court grant the relief requested hereinafter in the Prayer for Relief, and any further relief this Court deems just under the circumstances.

**AS AND FOR A SECOND CAUSE OF ACTION:**

**SECTION 1983 – UNCONSTITUTIONAL POLICY AS APPLIED AGAINST DEFENDANT CITY**

**THE POLICY AND DEFENDANT'S ACTIONS VIOLATE THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**

170. The averments of paragraphs 1-156 are repeated and alleged in full force and effect as if repeated in their entirety herein.

171. The First Amendment to the United States Constitution, applied to the States through the Fourteenth Amendment, prohibits unconstitutionally abridging the free exercise of religion.

172. Plaintiffs have a personal belief in the Biblical mandate to spread the Gospel of Jesus Christ, and Plaintiffs engage in activities, for the purpose of spreading the Gospel of Jesus Christ, that are prohibited by the Policy, as interpreted and enforced by Defendant.

173. The Bible instructs believers to share the Gospel of Jesus Christ with others, and Plaintiffs rely on the Bible to guide their words and actions.

174. As interpreted and enforced by the City, Plaintiffs' manner of free exercise of religion is prohibited by the Policy.

175. The City's officers', agents', and/or employees' actions were performed under color of state law in that they claimed to be performing an official duty, but their acts were

outside the limits of lawful authority and abusive in manner, and they further acted in a way that misused their power, and were able to do so only because of their positions as City officials.

176. The City's actions were done with malice or reckless indifference to Plaintiffs' right to the free exercise of religion.

177. The City's enforcement requires Plaintiffs to censor their religious speech and imposes a substantial burden on Plaintiffs that is not imposed on other individuals.

178. By forcing Plaintiffs to choose between abandoning their religious beliefs in order to gain access to speech in the City's Public Spaces, and, alternatively, abiding by their religious beliefs only to be arrested, cited, and fined, the City has imposed a substantial burden on Plaintiffs' sincerely-held religious beliefs and the exercise of their religion.

179. As applied, the Policy unconstitutionally attempts to convert the City's streets, sidewalks, and parks from traditional public fora into a nonpublic forum during Special Events conducted in the City.

180. As applied, the Policy unconstitutionally limits Plaintiffs' free exercise of religion by forcing Plaintiffs to move out of a traditional public forum during Special Events.

181. As applied, the Policy unconstitutionally imposes a burden on Plaintiffs' and other individuals' constitutional rights because it:

a. allows for the exercise of unbridled discretion; and,

b. lacks narrow tailoring, fails to achieve any legitimate government purpose, and fails to leave open alternative avenues for expression; and,

c. bars the free exercise of religion of Plaintiffs and possibly other third-party citizens in a traditional public forum.

182.    The Policy as applied impedes Plaintiffs' right to the free exercise of religion because it denies Plaintiffs' right to the free exercise of religion and satisfies no rational, substantial, or compelling government interest in the least restrictive means possible.

183.    As applied, Plaintiffs' manner of free exercise of religion is prohibited by the Policy.

184.    Plaintiffs were deprived of their right under the First Amendment to engage in free exercise of religion activities prohibited by the Policy as applied.

185.    Plaintiffs have been, and continue to be, deprived of their right under the First Amendment to engage in the free exercise of religion.

186.    Plaintiffs have suffered injuries and damages as a result of the City's deprivation of their rights, including but not limited to mental and emotional distress, impairment of reputation, personal humiliation, and other tangible and intangible harms that would not exist but for the City's actions and/or omissions, and these harms are reasonably certain to be experienced into the future.

WHEREFORE, Plaintiffs respectfully request that this Court grant the relief requested hereinafter in the Prayer for Relief, and any further relief this Court deems just under the circumstances.

**AS AND FOR A THIRD CAUSE OF ACTION:**

**SECTION 1983 – UNCONSTITUTIONAL POLICY AS APPLIED
AGAINST DEFENDANT CITY**

**THE POLICY AND DEFENDANT' ACTIONS VIOLATE THE
DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT
TO THE UNITED STATES CONSTITUTION**

187.    The averments of paragraphs 1-156 are repeated and alleged in full force and effect as if repeated in their entirety herein.

188.    The Fourteenth Amendment to the United States Constitution prohibits unconstitutionally abridging the Freedom of Speech and/or the Free Exercise of Religion.

189.    The City's actions, policies, and practices, and failure to adequately supervise and adequately train the City's officials, agents, and employees, and the resultant enforcement as alleged herein, lack sufficient objective standards to curtail the discretion of the City's officials and police officers. This provides the City and its officials, agents, and employees the opportunity to enforce speech restrictions in an *ad hoc*, arbitrary, and discriminatory manner.

190.    The City's actions, policies, and practices unconstitutionally impose a burden on Plaintiffs' and other individuals' constitutional rights because they:

a.      allow for the exercise of unbridled discretion; and,

b.      lack narrow tailoring, fail to achieve any legitimate government purpose, and fail to leave open alternative avenues for expression; and,

c.      bar the free speech and free exercise of religion of Plaintiffs and possibly other third-party citizens in a traditional public forum.

191.    Plaintiffs were deprived of their constitutional rights prohibited by the City's Policy as interpreted and enforced by the City.

192. The City's actions, policies, and practices unconstitutionally restrict and prohibit Plaintiffs' rights under the First Amendment to engage in Freedom of Speech and Free Exercise of Religion activities.

193. The City's actions, policies, and practices are unconstitutionally overbroad and are not narrowly tailored to address the City's interests, thereby allowing the City's agents and employees to unconstitutionally restrict and prohibit Plaintiffs' right, and those of the general public, to engage in Freedom of Speech and Free Exercise of Religion activities otherwise protected under the First Amendment.

194. Plaintiffs were deprived of their right to engage in Freedom of Speech and Free Exercise of Religion activities prohibited by the Policy as interpreted and enforced by the City.

195. Plaintiffs have been, and continue to be, deprived of their right to engage in Freedom of Speech and Free Exercise of Religion activities.

196. Plaintiffs have suffered injuries and damages as a result of the City's deprivation of their rights, including but not limited to mental and emotional distress, impairment of reputation, personal humiliation, and other tangible and intangible harms that would not exist but for the City's actions and/or omissions, and these harms are reasonably certain to be experienced into the future.

WHEREFORE, Plaintiffs respectfully request that this Court grant the relief requested hereinafter in the Prayer for Relief, and any further relief this Court deems just under the circumstances.

**AS AND FOR A FOURTH CAUSE OF ACTION:**

**THE POLICY AS APPLIED AGAINST DEFENDANT CITY**

**THE POLICY AND DEFENDANT'S ACTIONS VIOLATE TENNESSEE'S RELIGIOUS FREEDOM RESTORATION ACT**

197. The averments of paragraphs 1-156 are repeated and alleged in full force and effect as if repeated in their entirety herein.

198. Tennessee's Religious Freedom Restoration Act of 2009, Title 4, Chapter 21, Part 11, C.A. § 4-21-1101, prohibits the City from substantially burdening Plaintiffs' religious exercise absent the City bringing forth evidence that the burden upon Plaintiffs satisfies a compelling government interest in the least restrictive means possible.

199. Plaintiffs share a personal belief and mandate to spread the Gospel of Jesus Christ and Plaintiffs, as individuals and as associates, engage in activities, for the purpose of spreading the Gospel of Jesus Christ, that are prohibited by the Policy as interpreted and enforced by the City.

200. The Bible instructs believers to share the Gospel of Jesus Christ with others, and Plaintiffs rely on the Bible to guide their words and actions.

201. As interpreted and enforced by the City, Plaintiffs' manner of free exercise of religion is prohibited by the Policy.

202. Plaintiffs sought, and continue to seek, to discuss issues from a religious perspective, to distribute religious literature, to display signs, and to engage in religious speech through sharing their faith.

203. The City's enforcement requires Plaintiffs to censor their religious speech and imposes a burden on Plaintiffs that is not imposed on other individuals.

204.     By forcing Plaintiffs to choose between abandoning their religious beliefs in order to gain access to speech in the City's Public Spaces, and, alternatively, abiding by their religious beliefs only to be arrested, cited, and/or fined, the City has imposed a substantial burden on Plaintiffs' sincerely held religious beliefs and the exercise of their religion.

205.     As applied, the Policy attempts to convert the City's streets, sidewalks, and parks from traditional public fora into a nonpublic forum during Special Events conducted in the City.

206.     As applied, the Policy limits Plaintiffs' free exercise of religion by forcing Plaintiffs to move out of a traditional public forum during Special Events.

207.     As applied, the Policy imposes a burden on Plaintiffs' and other individuals' constitutional rights because it:

    a.     allows for the exercise of unbridled discretion; and,

    b.     lacks narrow tailoring, fails to achieve any legitimate government purpose, and fails to leave open alternative avenues for expression; and,

    c.     bars the free exercise of religion of Plaintiffs and possibly other third-party citizens in a traditional public forum.

208.     The Policy as applied impedes Plaintiffs' right to the free exercise of religion because it denies Plaintiffs' right to the free exercise of religion and satisfies no rational, substantial, or compelling government interest in the least restrictive means possible.

209.     As applied, Plaintiffs' manner of free exercise of religion is prohibited by the Policy.

210. Plaintiffs were deprived of their right under Tennessee's Religious Freedom Restoration Act of 2009, Title 4, Chapter 21, Part 11, C.A. § 4-21-1101, to engage in free exercise of religion activities prohibited by the Policy as applied.

211. Plaintiffs have been, and continue to be, deprived of their right under Tennessee's Religious Freedom Restoration Act of 2009, Title 4, Chapter 21, Part 11, C.A. § 4-21-1101, to engage in the free exercise of religion.

212. Plaintiffs have suffered injuries and damages as a result of the City's deprivation of their rights, including but not limited to mental and emotional distress, impairment of reputation, personal humiliation, and other tangible and intangible harms that would not exist but for the City's actions and/or omissions, and these harms are reasonably certain to be experienced into the future.

WHEREFORE, Plaintiffs respectfully request that this Court grant the relief requested hereinafter in the Prayer for Relief, and any further relief this Court deems just under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs request a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment as follows:

**AS TO COUNT I:**

1. That this Court assume jurisdiction of this matter; and,
2. That this Court issue a preliminary and permanent injunction restraining and enjoining Defendant, and all persons acting in concert or participating with

Defendant, from enforcing the City's Special Event Policy, Procedure and Application in the manner it was enforced against Plaintiffs on September 15, 2018; and,

3. That this Court issue the requested injunctive relief without a condition of bond or other security; and,

4. That this Court issue Declaratory Judgment under the Declaratory Judgment Act to determine Plaintiffs' and Defendant's rights and duties regarding enforcement of the City's Special Event Policy, Procedure and Application; and,

5. That this Court enter a judgment and decree declaring that Defendant's enforcement, interpretation, and application of the City's Special Event Policy, Procedure and Application, in the manner it was enforced against Plaintiffs on September 15, 2018, violated Plaintiffs' right to freedom of speech; and,

6. That this Court adjudge, decree, and declare the rights and other legal relations with the subject matter here in controversy, in order that such declaration shall have the force and effect of final judgment; and,

7. That this Court grant Plaintiffs an award of nominal and/or compensatory damages against Defendant; and,

8. That this Court retain jurisdiction of this matter for the purpose of enforcing any Orders; and,

9. That this Court award Plaintiffs' costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, Fed. R. Civ. P. 54, and 28 U.S.C. § 1920, or other applicable law; and,

10. That this Court grant Plaintiffs such other and further relief as may be just and proper.

**AS TO COUNT II:**

1. That this Court assume jurisdiction of this matter; and,

2. That this Court issue a preliminary and permanent injunction restraining and enjoining Defendant, and all persons acting in concert or participating with Defendant, from enforcing the City's Special Event Policy, Procedure and Application in the manner it was enforced against Plaintiffs on September 15, 2018; and,

3. That this Court issue the requested injunctive relief without a condition of bond or other security; and,

4. That this Court issue Declaratory Judgment under the Declaratory Judgment Act to determine Plaintiffs' and Defendant's rights and duties regarding enforcement of the City's Special Event Policy, Procedure and Application; and,

5. That this Court enter a judgment and decree declaring that Defendant's enforcement, interpretation, and application of the City's Special Event Policy, Procedure and Application, in the manner it was enforced against Plaintiffs on September 15, 2018, violated Plaintiffs' right to the free exercise of religion; and,

6. That this Court adjudge, decree, and declare the rights and other legal relations with the subject matter here in controversy, in order that such declaration shall have the force and effect of final judgment; and,

7. That this Court grant Plaintiffs an award of nominal and/or compensatory damages against Defendant; and,

8. That this Court retain jurisdiction of this matter for the purpose of enforcing any Orders; and,

9. That this Court award Plaintiffs' costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, Fed. R. Civ. P. 54, and 28 U.S.C. § 1920, or other applicable law; and,

10. That this Court grant Plaintiffs such other and further relief as may be just and proper.

**AS TO COUNT III:**

1. That this Court assume jurisdiction of this matter; and,

2. That this Court issue a preliminary and permanent injunction restraining and enjoining Defendant, and all persons acting in concert or participating with Defendant, from enforcing the City's Special Event Policy, Procedure and Application in the manner Defendant enforced it against Plaintiffs on September 15, 2018; and,

3. That this Court issue the requested injunctive relief without a condition of bond or other security; and,

4. That this Court issue Declaratory Judgment under the Declaratory Judgment Act to determine Plaintiffs' and Defendant's rights and duties regarding enforcement of the City's Special Event Policy, Procedure and Application; and,

5. That this Court enter a judgment and decree declaring that Defendant's

enforcement, interpretation, and application of the City's Special Event Policy, Procedure and Application, in the manner it was enforced against Plaintiffs on September 15, 2018, violated Plaintiffs' right to due process; and,

6. That this Court adjudge, decree, and declare the rights and other legal relations with the subject matter here in controversy, in order that such declaration shall have the force and effect of final judgment; and,

7. That this Court grant Plaintiffs an award of nominal and/or compensatory damages against Defendant in an amount to be determined by the trier of fact; and,

8. That this Court retain jurisdiction of this matter for the purpose of enforcing any Orders; and,

9. That this Court award Plaintiffs' costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, Fed. R. Civ. P. 54, and 28 U.S.C. § 1920, or other applicable law; and,

10. That this Court grant Plaintiffs such other and further relief as may be just and proper.

**AS TO COUNT IV:**

1. That this Court assume jurisdiction of this matter; and,

2. That this Court issue a preliminary and permanent injunction restraining and enjoining Defendant, and all persons acting in concert or participating with Defendant, from enforcing the City's Special Event Policy, Procedure and

Application in the manner it was enforced against Plaintiffs on September 15, 2018; and,

3.    That this Court issue the requested injunctive relief without a condition of bond or other security; and,

4.    That this Court issue Declaratory Judgment under the Declaratory Judgment Act to determine Plaintiffs' and Defendant's rights and duties regarding enforcement of the City's Special Event Policy, Procedure and Application; and,

5.    That this Court enter a judgment and decree declaring that Defendant's enforcement, interpretation, and application of the City's Special Event Policy, Procedure and Application, in the manner it was enforced against Plaintiffs on September 15, 2018, violated Plaintiffs' rights under Tennessee's Religious Freedom Restoration Act of 2009, Title 4, Chapter 21, Part 11, C.A. § 4-21-1101; and,

6.    That this Court adjudge, decree, and declare the rights and other legal relations with the subject matter here in controversy, in order that such declaration shall have the force and effect of final judgment; and,

7.    That this Court grant Plaintiffs an award of nominal and/or compensatory damages against Defendant; and,

8.    That this Court retain jurisdiction of this matter for the purpose of enforcing any Orders; and,

9. That this Court award Plaintiffs' costs and reasonable attorneys' fees pursuant to Tennessee's Religious Freedom Restoration Act of 2009, or other applicable law; and,

10. That this Court grant Plaintiffs such other and further relief as may be just and proper.

Respectfully submitted this 5th day of August 2020.

/s/ Kristin Fecteau Mosher
Kristin Fecteau Mosher, Esq.,
Tennessee Bar No.: 19772
Local Counsel for Plaintiffs
**The Law Office of Kristin Fecteau, PLLC**
5543 Edmonson Pike, Suite 229
Nashville TN 37211
Telephone: (615) 496-5747
E-mail: kristin@fecteaulaw.com

Frederick H. Nelson, Esq.
Florida Bar No.: 0990523
Lead Trial Counsel for Plaintiffs
David J. Markese, Esq.
Florida Bar No.: 0105041
Co-counsel for Plaintiffs
**AMERICAN LIBERTIES INSTITUTE**
P.O. Box 547503
Orlando, FL 32854-7503
Telephone: (407) 786-7007
Facsimile: (877) 786-3573
E-mail: rick@ali-usa.org
E-mail: dmakese@ali-usa.org
(Admitted *Pro Hac Vice*)

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

/s/Frederick H. Nelson
Frederick H. Nelson, Esq.
Florida Bar No.: 0990523
**American Liberties Institute**
P.O. Box 547503
Orlando, FL 32854-7503
Telephone: (407) 786-7007
Facsimile: (877) 786-3573
E-mail: rick@ali-usa.org
(Admitted *Pro Hac Vice*)

Attorneys for Plaintiffs