UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

JEREMIAH WALDROP *et al.*,           )
                                     )
        Plaintiffs,                  )
                                     )
v.                                   )        No. 2:19-CV-00103-JRG-CRW
                                     )
CITY OF JOHNSON CITY, TENNESSEE,     )
                                     )
        Defendant.                   )

## MEMORANDUM OPINION

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction [Doc. 38],

the Joint Statement of Undisputed Facts [Doc. 78], Defendant's Motion for Summary Judgment

[Doc. 86], Defendant's Memorandum Brief in Support of Motion for Summary Judgment [Doc.

87], Plaintiffs' Motion for Summary Judgment [Doc. 89], Plaintiffs' Statement of Undisputed

Facts [Doc. 90], Plaintiffs' Memorandum in Support of Motion for Summary Judgment [Doc. 91],

Defendant's Response in Opposition to Plaintiffs' Motion for Summary Judgment [Doc. 97],

Defendant's Response to Plaintiffs' Statement of Undisputed Facts [Doc. 98], and Plaintiffs'

Memorandum in Opposition to Defendant's Motion for Summary Judgment [Doc. 99]. For the

reasons herein, the Court will grant Defendant's motion and deny Plaintiffs' motions.

## I.    BACKGROUND

In 2018, Defendant City of Johnson City, Tennessee, granted TriPrideTN, Inc., a special-

event permit under its Special Event Policy, authorizing TriPride to hold its inaugural parade

and festival in downtown Johnson City. [Joint Undisputed Facts ¶¶ 1–4, 9–12; Keenan Dep.,

Doc. 87-6, at 27:19–21; *see* Chief Turner Decl., Doc. 87-3, ¶ 6; First Captain Rice Dep., Doc.

90-6, at 92:4–5]. The purpose of the parade and festival was to promote the inclusion of the

Lesbian, Gay, Bisexual, Transgender, and Queer or Questioning community. [Lyon Dep., Doc. 87-5, at 176:24–25, 177:1]. Johnson City's Special Event Policy states, in part, that "[i]t is the goal of the Special Event Review Committee to assist event organizers in planning safe and successful events that create a minimal impact on the communities surrounding the events." [Joint Undisputed Facts ¶ 4]. The Special Event Review Committee consists of various local officials, including law enforcement officers, fire-prevention officers, traffic engineers, public works specialists, and city attorneys. [Keenan Dep. at 108:1–6; Sergeant Tallmadge Dep., Doc. 87-15, at 66:8–22].

The Johnson City Police Department was in charge of security for TriPride's parade and festival. [Chief Turner Decl. ¶ 5; Sergeant Tallmadge Decl., Doc. 87-2, ¶ 4]. Although the parade and festival were free of charge and open to any member of the public who passed through a security checkpoint, [Joint Undisputed Facts ¶¶ 15–19], the Special Event Review Committee decided to allow TriPride to "control who could enter the Festival," [Chief Turner Decl. ¶ 9], after the Johnson City Police Department had learned of credible threats against TriPride, [*id.* ¶¶ 4–8; Second Captain Rice Dep., Doc. 90-9, at 19:11–18].[1] In an effort to mitigate these threats, the Johnson City Police Department worked with the Federal Bureau of Investigation and the Tennessee Bureau of Investigation. [Chief Turner Decl. ¶ 5]. The Johnson City Police Department also erected a designated "protest area," though it was located outside the festival's event area, in the hope that protestors would use that area. [First Captain Rice Dep. at 92:2–17; Joint Undisputed Facts ¶ 21]. In addition, the Special Event Review Committee authorized street closures for the parade, which took place on September 15, 2018, [Joint Undisputed Facts

---

[1] The Johnson City Police Department had become aware that officials in Knoxville, Tennessee, in response to similar threats, had previously allowed organizers of a gay-pride parade in Knoxville to control access to their parade. [Chief Turner Decl. ¶¶ 6–8]. In granting control to the organizers, the City of Knoxville obtained favorable results in preventing the threats of violence from coming to fruition. [*Id.* ¶ 8].

¶¶ 2, 9, 15–19], with a combined law-enforcement presence of more than two hundred officers and agents from the Johnson City Police Department, the TBI, and the FBI, [Chief Turner Decl. ¶ 5].

On that day, the festival began once the parade ended and was held in Founders Park, "a City park owned and operated by Johnson City." [Joint Undisputed Facts ¶¶ 13, 18–19, 27]. The "event area" for the festival, however, included not only Founders Park but also the peripheral public sidewalks and streets surrounding the park. [*Id.* ¶¶ 18–19, 27]. The festival drew about 10,000 people, [Lyon Dep., Doc. 97-2, at 222:22–24], and as it was underway, Plaintiff Phillip Self entered Founders Park, where he spoke to festival goers and distributed religious materials to them without incident. [Joint Undisputed Facts ¶ 25].

But at some point, Mr. Self and three of his companions—including Plaintiff Jeremiah Waldrop, who often preaches on street corners and at festivals, [Joint Undisputed Facts ¶ 22; Waldrop Dep., Doc. 87-16, at 29:6–14]—appear to have caused a disturbance inside or around Founders Park, [Lyon Dep., Doc. 87-18, at 85:1–15]. According to Kenn Lyon, an affiliate of TriPride and one of the festival's organizers, Mr. Self, Mr. Waldrop, and their companions ("Plaintiffs") were blocking the entrance to the park while preaching to festival goers, prompting another TriPride affiliate, George Chamoun, to summon police officers. [*Id.*]. The officers moved Plaintiffs away from the entrance to a nearby sidewalk. [*Id.*; Def.'s Answers to Req. for Admis., Doc. 90-14, ¶ 15; First Captain Rice Dep. at 22:19–25, 23:1–9].

After settling on the sidewalk, Plaintiffs used an amplification system and continued to preach—though their preaching involved the use of slurs and animadversions. [Video: TriPride Festival (on file with the Court)]. While preaching from the sidewalk, they remained inside the security checkpoint and within the festival's event area—an area that extended to the adjoining

street, Commerce Street, which was closed for the festival, [First Captain Rice Dep. at 22:19–25, 23:1–9; Captain Church Dep., Doc. 87-4, at 74:14–25]—and they had interactions and confrontations with festival goers, drawing the presence of police officers, [Video: TriPride Festival; Captain Church Dep. at 74:24–25].

At that point, Plaintiffs again captured the attention of Mr. Chamoun, who insisted that Plaintiffs were bothering the festival goers and urged officers to remove them outright from the festival's event area, [First Captain Rice Dep. at 19:6–12; First Captain Rice Dep., Doc. 87-10, at 21:15–21], but the officers declined to do so, [First Captain Rice Dep., Doc. 90-6, at 19:13–15, 22:1–14; Lyon Dep., Doc. 87-18, at 85:16–19]. In the officers' view, Plaintiffs, from the sidewalk, were not interfering with the events going on in Founders Park or with TriPride's expressive message. [First Captain Rice Dep., Doc. 90-6, at 22:8–14; Church Dep. at 78:7–17]. When Plaintiffs, however, asked one of the officers if they would be arrested if they re-entered Founders Park, the officer said that they would be. [Video: TriPride Festival; Lieutenant Peters Dep., Doc. 87-9, at 40:18–20]. Plaintiffs remained on the sidewalk, where they continued preaching for several hours without re-entering the park. [Church Dep. at 78:18–22; Self Dep., Doc. 98-8, at 66:5–12].

Plaintiffs have now filed suit in this Court against Johnson City under 42 U.S.C § 1983, alleging that Johnson City is municipally liable because its police officers, while acting in their official capacities, violated their rights under the United States Constitution. More specifically, Plaintiffs maintain that the officers infringed their constitutional rights to free speech and free exercise of religion by enforcing Johnson City's Special Event Policy in a way that "forc[ed] [them] to move out of a traditional public forum during Special Events." [Am. Compl., Doc. 72, ¶¶ 163, 180]. In addition to these claims under the First Amendment's Free Speech Clause and

Free Exercise Clause, Plaintiffs assert that the officers violated their constitutional rights under the Fourteenth Amendment's Due Process Clause, alleging that they "enforce speech restrictions in an *ad hoc*, arbitrary, and discriminatory manner." [*Id.* ¶ 189]. And lastly, Plaintiffs also allege that the officers violated the Tennessee Religious Freedom Restoration Act, Tennessee Code Annotated § 4-1-407. [*Id.* ¶¶ 197–212].

In bringing these claims, Plaintiffs also moved for a preliminary injunction, to enjoin Johnson City from enforcing its Special Event Policy. [Pls.' Mot. Prelim. Inj., Doc. 38]. In response to Plaintiffs' motion for a preliminary injunction, the Court held a hearing, after which it provided the parties with notice of its intent, under Federal Rule of Civil Procedure 65(a)(2), to advance and consolidate the trial on the merits with the hearing, though it first permitted the parties to engage in limited discovery. [Order, Doc. 48, at 1–3]. Having completed discovery, the parties have now filed cross motions for summary judgment, which the Court has carefully considered and is prepared to rule on.

## II.    LEGAL STANDARD

Summary judgment is proper when the moving party shows, or "point[s] out to the district court," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), that the record—the admissions, affidavits, answers to interrogatories, declarations, depositions, or other materials—is without a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a), (c). The moving party has the initial burden of identifying the basis for summary judgment and the portions of the record that lack genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party discharges that burden by showing "an absence of evidence to support the nonmoving party's" claim or defense, *id.* at 325, at which point the

nonmoving party, to survive summary judgment, must identify facts in the record that create a genuine issue of material fact, *id.* at 324.

Not just any factual dispute will defeat a motion for summary judgment—the requirement is "that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the case under the applicable substantive law, *id.*, and an issue is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In short, the inquiry is whether the record contains evidence that "presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. When ruling on a motion for summary judgment, a court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A court may also resolve pure questions of law on a motion for summary judgment. *See Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 550 (6th Cir. 2015).

## III.  ANALYSIS

Section 1983 permits a claim for damages against "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Because § 1983 has "a 'color of law' requirement," a defendant can be liable "only if state law, whether provided by statute or judicially implied, empowers him with some legal obligation to act." *Doe v. Claiborne County*, 103 F.3d 495, 512 (6th Cir. 1996) (citation omitted). A claim under § 1983 therefore consists

6

of two elements: the defendant (1) must deprive the plaintiff of either a constitutional right or a federal statutory right and (2) must deprive the plaintiff of one of these rights while acting under the color of state law (i.e., state action). *Id.* at 511. "Absent either element, a section 1983 claim will not lie." *Christy v. Randlett*, 932 F.2d 502, 504 (6th Cir. 1991). Under the second element, the parties agree that Johnson City's officers "acted under color of law in all of their interactions with and conduct related to Plaintiffs." [Joint Undisputed Facts ¶ 33]. The principle question for the Court, therefore, is whether, under the first element, the officers deprived Plaintiffs' of their constitutional rights.

### A. The First Amendment

The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Within this language resides the Free Speech Clause, in which our Founding Fathers preserved the inalienable right to freedom of speech, "a cornerstone of our society." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2318 (2019) (Sotomayor, J., concurring in part and dissenting in part). Indeed, "it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions," and it is "essential to the security of the Republic." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) (quotations omitted); *see Bible Believers v. Wayne County*, 805 F.3d 228, 243 (6th Cir. 2015) (recognizing that the First Amendment's safeguards "appl[y] to loathsome and unpopular speech with the same force as it does to speech that is celebrated and widely accepted," including "expressive behavior that is deemed distasteful and highly offensive to the vast majority of people" (citations omitted)).

The issue of whether Johnson City violated Plaintiffs' right to free speech is outcome-determinative in this case. In other words, the Court's determination as to whether Johnson City's officers trammeled Plaintiffs' right to free speech will also resolve Plaintiffs' additional claims under the Free Exercise Clause, the Due Process Clause, and the Tennessee Religious Freedom Restoration Act. *See Bible Believers*, 805 F.3d at 256 (deciding the plaintiffs' free-exercise claim "on the same basis" as the free-speech claim because "[f]ree exercise claims are often considered in tandem with free speech claims and may rely entirely on the same set of facts" (citing *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton,* 536 U.S. 150, 160–69 (2002); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 841 (1995))); *compare* [Am. Compl. ¶ 189 (alleging that Plaintiffs' due-process claim is based on Johnson City's "speech restrictions"), *with Fisher v. Ghee*, No. 99-3392, 2000 WL 302775, *1 (6th Cir. Mar. 17, 2000) ("Without a liberty interest, [a party] has no due process claim." (citing *Ky. Dep't of Corrs. v. Thompson,* 490 U.S. 454, 460 (1989); *Pusey v. City of Youngstown,* 11 F.3d 652, 656 (6th Cir.1993))), *and First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 780 (1978) (stating that freedom of speech is a liberty interest); *see also Christ Church Pentecostal v. Tenn. State Bd. of Equalization*, 428 S.W.3d 800, 821 (Tenn. Ct. App. 2013) (treating an analysis under the Free Exercise Clause as co-extensive with an analysis under the Tennessee Religious Freedom Restoration Act). The Court will therefore start, and end, its analysis of the constitutionality of the officers' actions with the Free Speech Clause.

1. Content Neutrality

In determining whether Johnson City violated Plaintiffs' free-speech rights, the Court must engage in a three-part inquiry: (1) it decides whether Johnson City excluded speech that comes within the First Amendment's protection; (2) it considers the type of forum in which the

8

speech took place; and (3) it addresses whether Johnson City's reason for excluding the speech from the relevant forum can withstand the appropriate level of legal scrutiny. *Cornelius v. NAACP Legal Defense and Educ. Fund.*, 473 U.S. 788, 797 (1985). As to the first two inquiries, the parties agree that Plaintiffs' speech has protection under the aegis of the First Amendment and that the festival's event area is a traditional public forum. [Pls.' Mem. at 2–4; Def.'s Mem. at 13]. The third inquiry therefore governs the Court's analysis.

When a governmental entity like Johnson City restricts a private citizen's speech in a traditional public forum, the Court must apply one of two legal standards to this third inquiry, depending on Johnson City's stated reason for excluding the speech. If Johnson City restricted Plaintiffs' speech because of its content, the Court applies a strict-scrutiny standard to that restriction, which is permissible only if it is "narrowly tailored to be the least-restrictive means available to serve a compelling government interest." *Bible Believers*, 805 F.3d at 248 (citing *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000)). A content-based restriction is one "that target[s] speech based on its communicative content," and it is "presumptively unconstitutional." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) (citations omitted).

On the other hand, if Johnson City had a content-neutral reason for restricting Plaintiffs' speech and the restriction was reasonable in the context of the time, place, and manner in which the speech arose, *see Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) ("The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time."), the Court applies an intermediate-scrutiny standard to that restriction, *Saieg v. City of Dearborn*, 641 F.3d 727, 734–35 (6th Cir. 2011). Under the intermediate-scrutiny test, a content-neutral restriction of speech in a traditional public forum will be permissible so long as it is "narrowly tailored to serve a significant government interest"

9

and "leave[s] open ample alternative channels of communication." *Id.* at 735 (quotation omitted). A content-neutral restriction is one that "is justified without reference to the content . . . of the regulated speech." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 696 (2010) (quotation omitted). "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech *because* of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (emphasis added) (citation omitted); *see id.* ("The government's purpose is the controlling consideration.").

Plaintiffs urge the Court to apply strict scrutiny, whereas Johnson City encourages the Court to apply intermediate scrutiny. According to Johnson City, intermediate scrutiny is appropriate because it restricted Plaintiffs' speech for a content-neutral reason: to ensure that TriPride, as a permit holder, could use its permit for its intended purpose. [Def.'s Mem. at 13–19]. Johnson City relies on the Supreme Court's decision in *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston*, 515 U.S. 557 (1995), as well as the Sixth Circuit's decision in *Sistrunk v. City of Strongsville*, 99 F.3d 194 (6th Cir. 1996), arguing that both cases establish that permit holders have a First Amendment right to protection of their expressive message from interreference from others.

In *Hurley*, the Supreme Court declared unconstitutional a state law that required the South Boston Allied War Veterans Council, a private group, to include the Irish-American Gay, Lesbian and Bisexual Group of Boston in a St. Patrick's day parade for which it had obtained a permit. In striking down the state law, the Supreme Court was concerned that the inclusion of openly gay, lesbian, and bisexual marchers would "alter the [Council's] expressive content of their parade" and even cause others to mistakenly attribute their speech to the Council. *Hurley*,

515 U.S. at 572–73, 577. The Supreme Court recognized that the First Amendment protected the parade organizers' "autonomy to choose the content of [their] own message," *id.* at 573, and that "when dissemination of a view contrary to one's own is forced upon a speaker intimately connected with the communication advanced, the speaker's right to autonomy over the message is compromised," *id.* at 576.

Relying on *Hurley*, the Sixth Circuit held in *Sistrunk* that organizers of a Bush-Quayle '92 campaign rally—for which the organizers had obtained a permit authorizing them to hold the rally on municipal property for its own invitees—could exclude from the rally a would-be participant who wanted to wear a button endorsing Bill Clinton. "To require that the organizers include buttons and signs for Bill Clinton," the Sixth Circuit wrote, "would alter the message the organizers sent to the media and other observers, even if the holders of signs and wearers of buttons did not otherwise interfere with the pro-Bush rally." *Sistrunk*, 99 F.3d at 199. While the Sixth Circuit acknowledged that the Clinton supporter could have stood with her button on the sidewalk leading up to the rally, she could not go so far as "to participate *in the committee's speech* while expressing her own discordant views." *Id.*

Plaintiffs, on the other hand, maintain that the facts in *Hurley* and *Sistrunk* are distinguishable from the facts in this case and that "[i]t is clear that [they] were not removed from the event area because they were attempting to participate in the message of TriPride." [Pls.' Mem. at 8]. In Plaintiffs' view, "[i]t is clear, however, that [they] were removed based on the content of their message." [*Id.*]. To support this view, Plaintiffs direct the Court's attention to the evidence showing that officers declined to remove them from the sidewalk despite Mr. Chamoun's insistence that they do so. [*Id.*]. Because the evidence establishes that the officers did not believe that Plaintiffs were interfering with the festival, Plaintiffs reason that the content

11

of their message must have been the reason why the officers, at TriPride's behest,[2] circumscribed their speech. [*Id.*]. According to Plaintiffs, the officers carried out an unconstitutional "heckler's veto." [*Id.* at 8–9]. In addition, Plaintiffs argue that the officers' restriction of their speech is especially invidious because it amounts to viewpoint discrimination, which, they note, is always subject to strict scrutiny. [*Id.* at 9–10].[3]

To start with, the Court agrees with Plaintiffs' contention that *Hurley* and *Sistrunk* are not factually on point. Unlike the plaintiffs in *Hurley* and *Sistrunk*, Plaintiffs were not seeking or attempting to participate in another's speech; rather, they were merely attendees at an event that was open to the public in a quintessential public forum. *See Parks v. City of Columbus*, 395 F.3d 643, 651 (6th Cir. 2005) (stating that *Hurley* and *Sistrunk* were factually off point because the plaintiff "d[id] not seek inclusion in the speech of another group" and was "merely another attendee of the festival," which was a permitted event open to the public in a traditional public forum); *see generally Hague v. Comm. Indus. Org.*, 307 U.S. 496, 515 (1939) ("[S]treets and parks . . . have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.").

---

[2] Johnson City does not attempt to argue that TriPride's involvement—or more specially, its authority to "control access into the festival," [Second Captain Rice Dep. at 19:13–14]—in any way renders this case without the character of state action. *See Hurley*, 515 U.S. at 566 (recognizing that "the guarantees of free speech . . . guard only against encroachment by the government"); *Parks v. City of Columbus*, 395 F.3d 643, 652 n.8 (6th Cir. 2005) ("We have indicated that authorization of exclusive use of public property will shift potential liability from the government to the private entity who functions as a state actor." (citing *Lansing v. Memphis in May*, 202 F.3d 821, 828 (6th Cir.2000))).

[3] A viewpoint-based restriction, which targets "speech based on 'the specific motivating ideology or the opinion or perspective of the speaker,'" is a subset of a content-based restriction but in a more virulent form. *Reed*, 135 S. Ct. at 2230 (quotation omitted); *see Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46 (Brennan, J., dissenting) (1983) ("Viewpoint discrimination is censorship in its purest form and government regulation that discriminates among viewpoints threatens the continued vitality of 'free speech.'").

12

Plaintiffs' situation would warrant comparisons to *Hurley* and *Sistrunk* only if Plaintiffs had requested, for example, to enter a float in the TriPride parade or occupy a stage or vendor booth at the festival. *Parks*, 395 F.3d at 651; *Startzell v. City of Philadelphia*, 533 F.3d 183, 194 (3d Cir. 2008). But they did not. And standing on a public sidewalk, they created little to no danger that bystanders would conflate their dissonant message with TriPride's message of inclusion for the LGBTQ+ community. *See McGlone v. Metro. Gov't of Nashville*, 749 F. App'x 402, 407 (6th Cir. 2018) ("We see no risk that those attending the festival, or even ambling past Public Square Park, would have mistaken [the plaintiffs'] preaching for the speech of the Pride Festival."); *Startzell*, 533 F.3d at 196 ("Appellants were dissenting speakers on the Philadelphia streets and sidewalks where OutFest took place. There was no danger of confusion that Appellants' speech would be confused with the message intended by Philly Pride." (citing *Mahoney v. Babbitt,* 105 F.3d 1452, 1456–57 (D.C. Cir. 1997))).

Still, Johnson City's assertion that TriPride, as a permit holder, had a First Amendment right to use its permit for its intended purpose is one that is hardly so at odds with *Hurley* and *Sistrunk*—or with First Amendment jurisprudence in general—that it warrants no consideration from the Court. *See Hurley*, 515 U.S. at 579 ("Our tradition of free speech commands that a speaker who takes to the street corner to express his views in this way should be free from interference[.]" (citations omitted)); *cf. Parks*, 395 F.3d at 649 (distinguishing the facts in *Parks* from "circumstances where the speaker attempted to interfere with the expressive message conveyed by the permit-holder"); *see McGlone*, 749 F. App'x at 423 (Moore, J., dissenting) ("The interest in allowing a permit-holder to hold its authorized event without being seriously disrupted (if not drowned out) is significant enough, too, to justify reasonable restraints on the location of speakers who cause ongoing disruption or interference." (footnote and citations

13

omitted)); *Startzell*, 533 F.3d at 198–99 ("The City has an interest in ensuring that a permit-holder can use the permit for the purpose for which it was obtained. This interest necessarily includes the right of police officers to prevent counter-protestors from disrupting or interfering with the message of the permit-holder.").

So although Plaintiffs undeniably had a First Amendment right to exercise their free speech while attending the TriPride festival, *see Carey v. Brown,* 447 U.S. 455, 460 (1980) ("[S]treets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." (internal quotation marks and quotation omitted)); *see also Parks*, 395 F.3d at 652 ("The City cannot . . . claim that one's constitutionally protected rights disappear because a private party is hosting an event that remained free and open to the public."), they did *not* have the right to interfere with TriPride's expressive message by disrupting the festival, *see Cornelius*, 473 U.S. at 799–800 ("Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to . . . the disruption that might be caused by the speaker's activities." (citation omitted)); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 387 (1969) ("[T]he right of free speech . . . does not embrace a right to snuff out the free speech of others." (citation omitted)); *Startzell*, 533 F.3d at 198 ("The right of free speech does not encompass the right to cause disruption, and that is particularly true when those claiming protection of the First Amendment cause actual disruption of an event covered by a permit.").

Yet the evidence shows that Plaintiffs did just that, and it establishes, without any dispute as to a genuine issue of material fact, that the officers moved Plaintiffs from Founders

Park to the sidewalk because of their actions and not because of the content of their message. The parties—surprisingly—provide the Court with a short line of insight into the events that led the officers to move Plaintiffs to the sidewalk. Based on the summary-judgment record, as the parties have prepared it, Mr. Lyon was the only person to testify as to those events, and he stated that the officers moved Plaintiffs to the sidewalk because they were blocking the entrance to Founders Park:

> Counsel: So do you remember any other interaction by any board member with any of those people [who are trying to bring this lawsuit]?
>
> Mr. Lyon: Yes. George had some interaction with them. There was an entrance on Commerce Street that went into the festival area, into Founders Park. And they were initially blocking that entrance with their protests, and George asked the police to have them move back away from that entrance so that people could still access the entrance to the park. And they did so.

[Lyon Dep., Doc. 87-18, at 85:6–15].

Plaintiffs have introduced no evidence into the summary-judgment record to counter Mr. Lyon's testimony that they were blocking the entrance,[4] an act of interference with ingress and

---

[4] Early on in this case, Johnson City filed a motion for summary judgment [Doc. 17] that is now defunct but is nonetheless at least worthy of mention. The Court denied the motion as moot because Johnson City and Plaintiffs had both requested the opportunity to engage in discovery. [Order, Doc. 61, at 1–3; Pls.' Rule 56(d) Mot., Doc. 33, at 1–9; Def.'s Notice, Doc. 46, at 2]. In support of that motion, Johnson City filed a declaration from Ron Adkins, who is one of TriPride's founders and was present for the TriPride festival. [Adkins Decl., Doc. 18-5, ¶¶ 3, 6]. According to Mr. Adkins, he called on the officers to remove Plaintiffs from Founders Park because of the content of their message: "I complained to law enforcement when the preachers came into Founders Park and began expressing a message of hatred towards homosexuality. This directly conflicted with TriPride's message. Therefore, I asked, on two occasions, for law enforcement to remove the preachers from within the Park and this occurred without incident." [Id. ¶ 6].

Under different circumstances, the Court would be obliged to rule that Mr. Adkins' declaration creates a material factual dispute with Mr. Lyon's testimony that the officers removed Plaintiffs from Founders Park because they were blocking the entrance. But again, Mr. Adkins' declaration concerns a motion not now before the Court, and neither party has filed Mr. Adkins' declaration in support of their current motions for summary judgment, nor do they mention it. Also, neither party has filed a deposition of Mr. Adkins in support of their current motions. Because neither party refers to, let alone cites, Mr. Adkins' declaration as evidence of the officers' purpose in removing Plaintiffs from the park, the Court mentions it only in passing in this footnote without considering it further. *See Parsons v. FedEx Corp.*, 360 F. App'x 642, 646 (6th Cir. 2010) ("A district court need only consider the evidence presented to it when considering a motion for summary judgment, regardless of whether other potentially relevant evidence exists somewhere in the record. A district court has no 'duty to sift through the record in search of evidence to support a party's opposition to summary judgment.' Thus, '[r]ule 56 allocates that duty to the opponent of the motion, who is

egress into the park and, ultimately, with TriPride's ability to use its special-event permit for its intended purpose. *See Saieg*, 641 F.3d at 735 ("Designating 'specific areas for specific things' at the Festival 'is not a regulation of speech.' Rather, it is a regulation of the places where some speech may occur." (internal quotation and quotation marks omitted) (citing *Hill v. Colorado*, 530 U.S. 703, 719 (2000))); *cf. McGlone*, 749 F. App'x at 404 (holding that the City of Nashville violated several preachers' free-speech rights by barring them from the Nashville Pride Festival partly because "[t]heir presence did *not* block people from queuing in line" (emphasis added)); *see Startzell*, 533 F.3d at 199–201 (determining that police officers had a content-neutral reason for ordering protestors to move a block up the street from the gay-pride festival partly because the chief of police testified that "'the significant part' of the reason he wanted [them] to move was because they were blocking the vendors"); *Kroll v. U.S. Capitol Police*, 847 F.2d 899, 903 (D.C. Cir. 1988) ("Preclusion of a message is the evil at which the content-neutrality principle is aimed, not arrangements of a public forum so that individuals and groups can be heard in an orderly and appropriate manner.").

Although Plaintiffs argue that they were the object of an unconstitutional heckler's veto, the evidence does not support this argument. A heckler's veto "occurs when police silence a speaker to appease the crowd and stave off a potentially violent altercation." *Bible Believers*, 805 F.3d at 234 (footnote omitted). But the officers did just the opposite. As Plaintiffs delivered their message via an amplification system from the sidewalk, an altercation, at times, appeared imminent: one festival goer extended both of his middle fingers toward Plaintiffs; others swore in their direction; a group displayed the Pride flag within feet or inches of their faces; and the Knoxville Gay Men's Chorus gathered around them, competing in song with their amplification

required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact.'" (quoting *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379 (6th Cir. 2007))).

16

system. [Video: TriPride Festival]. Yet, in the midst of all this, when Mr. Chamoun exhorted officers to expel Plaintiffs from the festival, the officers rebuffed him, [First Captain Rice Dep., Doc. 90-6, at 19:6–15, 22:1–14; Church Dep. at 78:7–17], and in fact, they allowed Plaintiffs to continue preaching for several more hours, [Lieutenant Peters Dep. at 78:18–22; Self Dep. at 66:5–12]—while remaining *within* the festival's event area and openly interacting with festival goers, [First Captain Rice Dep., Doc. 90-6, at 22:19–25, 23:1–9; Captain Church Dep. at 74:14–25]; *cf. Bible Believers*, 805 F.3d at 236, 241, 255 (determining that the defendants committed a heckler's veto because they completely "silenced" the preachers by "expel[ling]" them from the festival, so that their speech was "permanently cut[] off"). Simply, from the record evidence, no reasonable juror could conclude that the officers executed a heckler's veto.

While the evidence does establish that Johnson City, at least at the festival's outset, was content to allow TriPride to control access to the festival, [Chief Turner Decl. ¶ 9; Second Captain Rice Dep. at 19:11–18]—a show of deference that has the potential to draw censure from federal courts, *see, e.g.*, *McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076, 1106 (N.D. Fla. 2016) ("The City's stated policy of unquestioning deference to the whims of the permit holder in enforcing trespass statutes at a free and open-to-the-public event is, to put it gently, troubling.")—the facts of this case do not warrant that censure. Again, the evidence establishes that the officers moved Plaintiffs away from Founders Park's entrance only because they were blocking it—an act of interference with the festival. As Plaintiffs continued their preaching from the sidewalk, the officers made their *own* independent determinations as to whether to move them outside of the festival's event area, declining to heed Mr. Chamoun's demands for their outright removal:

> Captain Rice: I recalled being summoned to the sidewalk area where the street preachers were formed at the behest of George Chamoun—which is one of

the organizers for TriPride—with his insistence that we remove the preachers from the sidewalk.

I declined. He wasn't happy. I stood with my answer on that. And then I left and resumed my duties of everything else I had going on that day.

. . . .

When the TriPride wanted the preachers removed from the sidewalk, I saw that the expressive message of the preachers, the pastors, they wanted to get their message out to the TriPride attendees. And I thought it was reasonable for them to be allowed to stay there on the sidewalk to get—to get their message out. TriPride had an expressive message. The street preachers had an expressive message.

. . . .

So our goal and our stance was we did not limit the expressive message from anyone.

. . . .

Counsel: Would the Johnson City Police Department obey a request from TriPride to remove someone based on their expressive message?

Captain Rice: Well, I think in itself, no, sir, we would not.

[First Captain Rice Dep., Doc. 90-6, at 19:8–15; Second Captain Rice Dep. at 34:21–25, 35:1–4, 35:8–9, 35:15–19; *see* Captain Church Dep. at 78:16–17 (testifying that he did not order Plaintiffs to lower the volume of their amplification system); *see also* Lyon Dep., Doc. 87-18, at 85:16–19 (stating that the officers declined to remove Plaintiffs from the festival's event area)].

Still, Plaintiffs attempt to argue that the officers unlawfully "allowed TriPride to control who could enter the Festival area" and "to exclude whoever it wanted from the Festival area," [Pls.' Mem. at 14], relying on *Parks v. City of Columbus*, 395 F.3d 643 (6th Cir. 2005), *Deferio v. City of Syracuse*, 306 F. Supp. 3d 492 (N.D.N.Y. 2018), and *McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076 (N.D. Fla. 2016)—all cases in which the plaintiffs were peaceably expressing religious messages at festivals in public fora but were removed from them because

18

the permit holders simply did not want them there. But these cases are off point. Again, the evidence *here* shows that Johnson City's officers moved Plaintiffs away from Founders Park because they were blocking the entrance. And importantly, when Mr. Chamoun proclaimed that he wanted Plaintiffs expelled outright from the event area, the officers refused to accommodate him and instead allowed Plaintiffs to stay there. [Lyon Dep., Doc. 87-18, at 85:16–19; First Captain Rice Dep., Doc. 90-6, at 19:8–15; Second Captain Rice Dep. at 34:21–25, 35:1–4, 35:8–9, 35:15–19; Captain Church Dep. at 78:16–17]. In *Parks*, the plaintiff was apparently removed altogether from the festival's event area—to a location outside the "barricaded area," *Parks*, 395 F.3d at 646—whereas here in this case, Plaintiffs, after they relocated to the sidewalk, remained inside the security checkpoint and the festival's event area, where they continued to preach and freely interact with festival goers, [First Captain Rice Dep., Doc. 90-6, at 22:19–25, 23:1–9; Captain Church Dep. at 74:14–25]; *see Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981) ("[I]mportantly, the [restriction] has not been shown to deny access within the forum in question.").

In addition, Plaintiffs also cite Lieutenant Peters' testimony, in an apparent attempt to illustrate that officers did capitulate to the caprices of TriPride's organizers. [Pls.' Statement Undisputed Facts, Doc. 90, ¶¶ 42–43]. According to Lieutenant Peters, he told Plaintiffs that they could not re-enter Founders Park because TriPride "would tell us that they don't want you there." [Lieutenant Peters Dep. at 39:18–22]. "You would be asked to leave," he said, and "you could be cited." [*Id.* at 39:22–25, 40:1]. He also told Plaintiffs that "[y]'all have already been told you're not welcome over there, so you can't go over there," and "[y]ou will be arrested if you go over there." [*Id.* at 40:8–20].[5] Plaintiffs maintain that Lieutenant Peters' statements

---

[5] Plaintiffs also assert that several other officers—Officer Dillard, Sergeant Hodges, Sergeant Shepard, and Sergeant Sparks—made similar statements to Plaintiffs, but Plaintiffs cite no evidence for this assertion. [Pls.'

demonstrate that he unlawfully enforced the Special Event Review Committee's policy of allowing TriPride's affiliates to control access to the festival without "any limitation on [their] authority." [Pls.' Mem. at 9]. In this vein, Plaintiffs point to a specific portion of Lieutenant Peters' testimony, during which he said he was following municipal policy when he made the statements in question. [*Id.*; Pls.' Statement Undisputed Facts ¶ 44].

But Plaintiffs too loosely frame the legal issue here. The precise issue is not whether Lieutenant Peters did or did not follow a policy that, in its application, had constitutional repercussions. Rather, the analysis focuses on his *purpose* for doing so—that is, whether the evidence shows that Lieutenant Peters, as an officer acting under color of state law, sought to restrict Plaintiffs' speech because TriPride disagreed with its message or content. *See Ward*, 491 U.S. at 791 ("The principal inquiry in determining content neutrality" is whether the government restricts speech "*because* of disagreement with the message it conveys." (emphasis added) (citation omitted)); *id.* (recognizing that "[t]he government's purpose is the controlling consideration").

The Court is loath to ascertain whether Lieutenant Peters' words amount to a content-based salvo against Plaintiffs' First Amendment rights by viewing them in a silo and engaging in a "judicial psychoanalysis" of his "heart of hearts," as Plaintiffs appear to invite the Court to do. *McCreary County v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 862 (2005) (citation omitted). Instead, the Court must consider the record evidence as a whole, *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009), and as a whole, the record does not show that Lieutenant Peters

---

Statement Undisputed Facts ¶¶ 45–49]. Instead, they merely recite allegations in the parties' pleadings, [*id.*], but the parties' unverified pleadings are not evidence, *see Lopez v. Hart County*, No. 1:16-CV-00056-GNS-HBB, 2018 WL 4689472, at *1 n.1 (W.D. Ky. Sept. 28, 2018) (stating that "[a]n unverified complaint is not evidence and cannot contribute to the resolution of a motion for summary judgment" (quotation omitted)); *Otworth v. Budnik*, No. 1:13 CV 129, 2013 WL 70096328, at *2 (W.D. Mich. July 23, 2013) (noting that "statements made in unsworn pleadings are not evidence for the purpose of a summary judgment motion").

20

acted in opposition to the content of Plaintiffs' message on TriPride's behalf. Plaintiffs ignore the fact that Lieutenant Peters testified he did not even speak to any TriPride affiliate during the festival, much less enforce a directive from a TriPride affiliate to limit Plaintiffs' speech because of its content:

> Counsel: Did one of the organizers for the event talk to you at any time during the day of the event?
>
> Lieutenant Peters: No, sir.

[Lieutenant Peters Dep. at 41:15–17]. Along these lines, Lieutenant Peters testified that, in making the statements at issue, he was merely repeating information that another officer "had relayed" to him—information concerning the fact "that [Plaintiffs] had already been warned." [*Id.* at 41:18–24].

The evidence supports only the conclusion that the officers escorted Plaintiffs from Founders Park, and voiced any attendant warnings to them about their return there, in response to their obstruction of the entrance—a content-neutral reason for their removal. The record is simply without evidence showing that Lieutenant Peters or any other officer moved Plaintiffs away from Founders Park for any other reason, much less for the reason that the content of Plaintiffs' message was offensive or disagreeable. To the contrary, the evidence establishes— beyond any genuine issue of material fact—that the officers allowed Plaintiffs' message to endure within the festival's event area for hours into the day, despite TriPride's organizers' clamors for the officers to extinguish it. [First Captain Rice Dep., Doc. 90-6, at 19:8–15; Second Captain Rice Dep. at 34:21–25, 35:1–4, 35:8–9, 35:15–19; Captain Church Dep. at 78:16–17, 78:18–22; Self Dep. at 66:5–12; Lyon Dep., Doc. 87-18, at 85:16–19].

Along similar lines, Plaintiffs argue, in an attempt to show that the officers must have been targeting the content of their message, that the officers treated other protestors differently

21

from them. [Pls.' Mem. at 12]. Specifically, Plaintiffs claim that the officers did not curtail the speech of "potentially violent individuals" in the protest area, "for whom the additional security measures were implemented in the first place." [*Id.*]. But Plaintiffs cite no evidence showing that the occupants of the protest area *were* violent or disruptive in any way whatsoever—much less that the officers condoned their violence or disruption.[6] Without this evidence, Plaintiffs make not even the slightest headway in demonstrating that the officers were abiding of disruptive behavior from others but not from Plaintiffs. Besides, "'[d]ifferential impact' without more does not demonstrate that a regulation is content based." *Saieg*, 641 F.3d at 735 (quoting *Christian Legal Soc'y*, 561 U.S. at 696).

And incidentally, Plaintiffs' characterization of the officers' actions as "viewpoint" discrimination—repugnant though that type of discrimination may be when present—adds no kindling to their First Amendment claim because they acknowledge that the events at issue occurred in a public forum, rather than in a non-public forum. *See McGlone*, 749 F. App'x at 405 n.1 ("There is a distinction between content-based and viewpoint discrimination, but that distinction becomes salient when the speech is restricted in a non-public forum. . . . [B]ecause all agree that Public Square Park is a traditional public forum, the distinction between the two is a distinction without a difference." (citing *Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 48–49 (1983))).

In sum, no reasonable juror could conclude that the officers' restriction of Plaintiffs' speech was content-based in nature. Johnson City's justification for the restriction—to ensure that TriPride, as a permit holder, could use its permit for its intended purpose—is content-neutral in nature and is reasonable in the context of the time, place, and manner in which the

_____

[6] According to Captain Rice, "there wasn't [sic] many people" in the protest area; there were six or eight people at most. [First Captain Rice. Dep., Doc. 90-6, at 98:19–20].

speech arose. *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (observing that a "permit requirement," when content neutral, is a constitutionally permissible restriction on the time, place, and manner of speech so long as it is narrowly tailored and leaves open ample alternatives for communication); *Startzell*, 533 F.3d at 198 ("The Supreme Court has recognized permitting schemes as a content-neutral means for the government 'to regulate competing uses of public forums.'" (quoting *id.*)); *Kroll*, 847 F.2d at 903 ("A permit system embodiment of time, place, and manner restrictions . . . have long enjoyed the approbation of the Supreme Court." (citations omitted)). Intermediate scrutiny is therefore the appropriate legal standard.

2. Intermediate Scrutiny

"[T]he government may enforce reasonable time, place, and manner regulations as long as the restrictions "are content neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Saieg*, 641 F.3d at 735 (quotation omitted). Having determined that Johnson City's restriction of Plaintiffs' speech is a content-neutral regulation of the time, place and manner of that speech, the Court now turns its focus toward considering whether the restriction was narrowly tailored to serve a significant government interest and whether Johnson City left open ample alternative channels of communication. *Id.*; *see Heffron*, 452 U.S. at 649 ("A valid time, place, and manner regulation must also 'serve a significant governmental interest.'" (quotation omitted)). The burden is on Johnson City to show that its restriction of Plaintiffs' speech can withstand intermediate scrutiny. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816–17 (2000).[7]

---

[7] The three questions comprising the intermediate-scrutiny test—whether a restriction of speech is (1) narrowly tailored (2) to serve a significant government interest and (3) leaves open ample alternative channels of communication—are questions of law, *see Hoevenaar v. Lazaroff*, 422 F.3d 366, 368–69 (6th Cir. 2005); *see also Galena v. Leone*, 638 F.3d 186, 202–03 (3d Cir. 2011); *United States v. Friday*, 525 F.3d 938, 949 (10th Cir. 2008); *McRae v. Johnson*, 261 F. App'x 554, 557 (4th Cir. 2008); *United States v. Doe*, 968 F.2d 86, 88 (D.C. Cir. 1992), though if necessary, a court may empanel a jury to resolve any disputed questions of fact that are relevant to its legal

23

i. *Significant Government Interest*

While the Supreme Court and the lower federal courts—in an untold number of cases—have considered various types of government interests and addressed how those interests fare under the weight of intermediate scrutiny, and strict scrutiny, the Supreme Court has never articulated a bright-line test for courts to apply when determining whether a stated government interest is significant or not significant. *See United States v. Stevens*, 533 F.3d 218, 227 (3d Cir. 2008) (stating that "the Supreme Court has not always been crystal clear as to what constitutes a compelling interest in free speech cases"); *see also Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 188 (1979) (Blackmun, J., concurring) ("I have never been able fully to appreciate just what a 'compelling state interest' is."); *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968) (observing that the Supreme Court, "[t]o characterize the quality of the governmental interest which must appear," has "employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; [and] strong" (footnotes omitted)); Matthew D. Bunker et al., *Strict in Theory but Feeble in Fact? First Amendment Strict Scrutiny and the Protection of Speech,* 16 Comm. L. & Pol'y 349, 364 (2011) ("Case law actually suggests there is no bright-line standard for resolving what a compelling state interest looks like—no definitive criterion, no operational definition.").

The Supreme Court, however, has not left the federal judiciary bereft of guidance. The Supreme Court has stated that "a forum's special attributes [are] relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved." *Heffron*, 452 U.S. at

---

determinations, *Galena*, 638 F.3d at 203; *Thomas v. Schroer*, No. 2:13-cv-02987-JPM-cgc, 2016 WL 1261176, at *5 n.2 (W.D. Tenn. Mar. 30, 2016).

650–51 (citations omitted). But this statement, while straightforward on its face, requires a circuitous approach in application: a case-by-case assessment of how a specified government interest interrelates with the attributes of the relevant forum. *See Saieg*, 641 F.3d at 736 ("The defendants have named several interests that they find significant: relieving 'pedestrian overcrowding,' enhancing 'traffic flow,' minimizing 'threats to public safety,' and limiting 'disorderliness at the Festival.' In appropriate contexts, each of these governmental interests can be substantial."). In this case, Johnson City states that "the [significant] governmental interest was the protection of the First Amendment rights of TriPride" as a permit holder. [Def.'s Mem. at 19]. The issue of whether a governmental entity has a significant interest in safeguarding the First Amendment rights of a permit holder appears to be one of first impression in this circuit, as well as in other circuits.

Although the Sixth Circuit has yet to address this issue, every circuit court and district court that has addressed it has acknowledged that the government has a significant interest in protecting a permit holder's right to use its permit for its intended purpose. *See Startzell,* 533 F.3d at 198–99 ("The City has an interest in ensuring that a permit-holder can use the permit for the purpose for which it was obtained. This interest necessarily includes the right of police officers to prevent counter-protestors from disrupting or interfering with the message of the permit-holder.");[8] *see also Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 899 (9th Cir. 2008) ("[W]e accept for purposes of this appeal, without deciding, that . . . protecting the rights of permittees is a significant governmental interest."); *Warden v. Miranda*, No. CV-14-02050-TUC-DCB, 2017 WL 3130664, at *15 (D. Az. July 24, 2017) (recognizing a city's "significant government interest in protecting the free speech rights of permittees by ensuring that these

---

[8] Johnson City's characterization of its significant government interest in this case is a near facsimile to the Third Circuit's description of the City of Philadelphia's significant government interest in *Startzell*.

individuals and groups, having differing views, can be heard in an orderly and appropriate manner"); *Zalaski v. City of Hartford*, 838 F. Supp. 2d 13, 44 (D. Conn. 2012) ("Although the *Startzell* court's analysis focused on the interest in allowing the permitted speech to take place, the Court sees no reason why this reasoning is not equally applicable to an interest in allowing the permitted activity to take place."), *aff'd in part and vacated in part on other grounds*, 723 F.3d 382 (2d Cir. 2013).

While this Court recognizes the opinions of these circuit courts and district courts as persuasive authority, it is unwilling to rely on them to make the wholesale assertion that the government, in all cases, has a significant interest in protecting a permit holder's right to use its permit for its intended purpose. The Court, instead, must make an independent determination— specific to the particularized facts of this case—as to the significance of Johnson City's stated interest "in light of the characteristic nature and function of the particular forum involved." *Heffron*, 452 U.S. at 650–51 (citations omitted); *see Saieg*, 641 F.3d at 736. The most logical starting point for the Court in making this case-specific, independent determination is *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981), partly because of its instructive qualities and partly because of its factual similarities—i.e., the festival-like forum, the presence of a large crowd, and the free-speech rights in play.

In *Heffron*, the Supreme Court addressed the constitutionality of a local ordinance that required the distribution of any materials at the Minnesota State Fair to occur from a booth rented from the Minnesota Agricultural Society. *Id.* at 643–46. A religious society challenged the ordinance, arguing that it violated its First Amendment right to go into public places and freely communicate with others by distributing religious literature and soliciting donations. *Id.* The State of Minnesota, however, maintained that the ordinance was instrumental in allowing it

to advance a significant government interest: ensuring "the orderly movement and control of" the fair's "large crowds." *Id.* at 650. In the Supreme Court's view, "it [was] clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective," *id.* (quotation omitted), and it therefore held that "the State's interest in confining distribution, selling, and fund solicitation activities to fixed locations is sufficient to satisfy the requirement that a place or manner restriction must serve a substantial state interest," *id.* at 654.

In reaching this holding, the Supreme Court paid particular attention to the attributes of the public forum—the fairgrounds—noting that it "is a temporary event attracting great numbers of visitors" and "[t]he flow of the crowd and demands of safety are more pressing in the context of the Fair" than a public street. *Id.* at 651. In fact, the Supreme Court indicated that the state's interest was especially significant when it considered that "all other organizations . . . . would be entitled to distribute, sell, or solicit if the booth rule [could] not be enforced," a result that might bring a deluge of solicitors to the fairgrounds and impede the state from "managing the flow of the crowd." *Id.* at 654; *see id.* at 652 (stating that "[t]he justification for the [ordinance] should not be measured by the disorder that would result from granting an exemption solely to [the plaintiff]" but by the disorder that would result from other groups that would traverse the fairgrounds as well).

A fairground is not so dissimilar to a festival, and in Johnson City's case, the record establishes that Johnson City, like the State of Minnesota in *Heffron*, was acutely preoccupied with the safety and the management of the crowd—which was about 10,000 in number. [Lyon Dep., Doc. 97-2, at 222:22–24]. Leading up to the event, the Special Event Review Committee gathered at city hall on multiple occasions to discuss the festival and logistical concerns, [Keenan

Dep., Doc. 87-7, at 22:3–25, 23:1–4], and the Johnson City Police Department coordinated with, and in fact met with, the FBI, [Chief Turner Decl. ¶ 4]. According to the chief of police, "[s]ome of the groups that had been in Charlottesville, VA were expressing plans to attend the upcoming TriPride Parade and Festival." [*Id.*]. Another officer testified that "the white supremacist group called League of the South" was expected to attend the festival, and so were "Antifa groups that were going to counter-protest the League of the South" and other "groups that wanted to protest the counter-protestors." [First Captain Rice Dep., Doc. 90-6, at 59:13–19]. All in all, the fear among law enforcement was that "Johnson City [would] become another Charlottesville," whose aftermath was just one summer removed from the TriPride festival. [*Id.* at 59:22–23]. So, over two hundred law enforcement officers worked the TriPride festival—including officers from the FBI and TBI, [Chief Turner Decl. ¶ 5]—and in addition to the security checkpoints, the Johnson City Police Department erected the protest area, with the hope that it might help them maintain order and control, [First Captain Rice Dep., Doc. 90-6, at 92:2–17].

The legion of law enforcement officers, the road closures, the security checkpoints, and the protest area did not dispossess Founders Park or the sidewalks of their status as a public forum. *Parks*, 395 F.3d at 648. But without any question, they did transform them from a "continually open, often uncongested . . . place where people [could] enjoy the open air or the company of friends and neighbors in a relaxed environment" to "a temporary event attracting great numbers of visitors" who came to share in TriPride's inclusive message—and not without the threat of personal harm. *Heffron*, 452 U.S. at 651. Against this backdrop, Johnson City had a significant interest in ensuring that the TriPride festival's organizers and attendees—during a temporary event that carried the imprimatur of a government-issued permit—would have a safe and orderly venue in which to express their message under the First Amendment. *See Cox v.*

*Louisiana*, 379 U.S. 536, 554 (1965) ("The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy."); *see also Heffron*, 452 U.S. at 651 (stating that "[t]he flow of the crowd and demands of safety are more pressing in the context of the Fair").

In blocking the flow of festival goers into and out of Founders Park, Plaintiffs acted at odds with that government interest—and in a way that was especially volatile because of the large crowd, the high-profile nature of the event, and the effect that their actions, if allowed to continue, might have had on groups interested in disrupting the festival. *See Heffron*, 452 U.S. at 653–54 ("As we have indicated, the inquiry must involve not only [the plaintiff], but also all other organizations that would be entitled to distribute, sell, or solicit," because "there would be a much larger threat to the State's interest in crowd control if all other [organizations] could likewise move freely about the fairgrounds distributing and selling literature and soliciting funds at will."). And importantly, the record evidence—the committee meetings at city hall, the FBI's active involvement, the hundreds of law enforcement officers at the festival, the road closures, the security checkpoints, the erection of the protest area, and the festival's temporal proximity to the previous summer's events in Charlottesville—all show that Johnson City's stated interest was not unsubstantiated or speculative, but soberingly real. *See Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 664 (1994) (stating that when the government raises "asserted interests" associated with "prevent[ing] anticipated harms, it must . . . . demonstrate that the recited harms are real, not merely conjectural" (citations omitted)). So in sum, under this case's specific facts, Johnson City's interest in moving Plaintiffs away from the entrance to the nearby sidewalk is "sufficient to satisfy the requirement that a place or manner restriction must serve a substantial state interest." *Heffron*, 452 U.S. at 654.

ii. *Narrow Tailoring*

A content-neutral restriction of the time, place, and manner of speech "must be narrowly tailored to serve the government's legitimate, content-neutral interests," but "it need not be the least restrictive or least intrusive means of doing so." *Ward*, 491 U.S. at 798 (footnote omitted). In other words, the narrow-tailoring doctrine does not require perfect tailoring, *O'Toole v. O'Connor*, 802 F.3d 783, 790 (6th Cir. 2015); rather, it requires only "a close fit between ends and means," *McCullen v. Coakley*, 573 U.S. 464, 486 (2014), so that the restriction of speech does not "burden substantially more speech than is necessary to further the government's legitimate interests," *Ward*, 491 U.S. at 799.

In arguing that the officers' restriction of Plaintiffs' speech met the narrow-tailoring requirement, Johnson City highlights the evidence showing that Plaintiffs, after the officers moved them to the sidewalk, "continued to interact with Festival attendees for hours." [Def.'s Mem. at 19]. The Court agrees that the officers' restriction of Plaintiffs' speech was narrowly tailored because it did not burden Plaintiffs' speech substantially more than necessary to further Johnson City's significant interest in ensuring that TriPride could use its permit for its intended purpose. In fact, the record shows that any burden on Plaintiffs' speech was infinitesimal, if not non-existent.

No one prevented Plaintiffs from moving freely through Founders Park and distributing religious materials until they created a disturbance by blocking the entrance. [Joint Undisputed Facts ¶ 25; Self Dep. at 50:3–25, 51:1–12, 51:21–23; Lyon Dep., Doc. 87-18, at 85:1–15]; *see Startzell*, 533 F.3d at 202 (holding that "[t]he City's actions in this case were narrowly tailored to serve its significant interests" because the officers "did not initially ban [plaintiffs'] speech" but "let [plaintiffs] move about freely" through the festival "until [they] . . . blocked access to

30

vendors" (quotation omitted)). After the officers moved Plaintiffs to the sidewalk, they were still within the festival's event area, [First Captain Rice Dep., Doc. 90-6, at 22:19–25, 23:1–9; Captain Church Dep. at 74:14–25]; they enjoyed unfettered use of their amplification system; [Video: TriPride Festival; Captain Church Dep. at 78:16–17]; and they interacted with festival goers, and festival goers interacted with them, [Video: TriPride Festival; Captain Church Dep. at 74:24–25]; *see Heffron*, 452 U.S. at 655 ("[T]he [restriction] does not exclude [the plaintiff] from the fairgrounds, nor does it deny that organization the right to conduct any desired activity at some point within the forum."). And their message, in fact, reached the festival goers so swiftly and effectively that it resulted in back-and-forth verbal exchanges and confrontations with them. [Video: TriPride Festival]; *see Hill v. Colorado*, 530 U.S. 703, 726 (2000) ("As we have emphasized on more than one occasion, when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement[.]" (footnote omitted)). The call is not a close one. The officers' removal of Plaintiffs from the entrance to the sidewalk was a narrowly tailored means of serving its significant interest in ensuring that TriPride could use its permit for its intended purpose.

### iii. *Ample Alternative Channels of Communication*

Lastly, a content-neutral restriction of the time, place, and manner of speech "must leave open ample alternative channels by which speakers can communicate their messages, although speakers are 'not entitled to their best means of communication.'" *Saieg*, 641 F.3d at 740 (quotation omitted); *see Ward,* 491 U.S. at 802–03 ("That the city's limitations on volume may reduce to some degree the potential audience for respondent's speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate."

(citations omitted)). An alternative channel is not ample if the speaker is not able to reach his intended audience. *Saieg*, 641 F.3d at 740.

Again, Plaintiffs easily continued to reach their intended audience—the festival goers—after the officers moved them to the sidewalk. *See Startzell*, 533 F.3d at 203 ("Here, too, there is no showing that Appellants were unnecessarily limited in conveying their message from the location to which they were ordered to move, which was only about one-and-one-half blocks from OutFest's epicenter and near Philadelphia's biggest gay bar, a popular event location."). The officers therefore left open ample alternative channels by which Plaintiffs were able to communicate their message to their intended audience, and Johnson City, having now satisfied all the elements of intermediate scrutiny, establishes that it did not violate Plaintiffs' First Amendment right to free speech at the TriPride festival.

### B.  Municipal Liability

In the absence of a constitutional violation, Johnson City asserts that Plaintiffs' municipal liability claim fails as a matter of law. [Def.'s Mem. at 11]; *see Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." (citing *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986)); *see also Heller*, 475 U.S. at 799 ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."); *see, e.g.*, *Williams v. City of Chattanooga*, No. 18-5516, 2019 WL 2145649, at *5 (6th Cir. May 15, 2019) ("[B]ecause we find that the Officers did not violate [Plaintiff's] Fourth Amendment rights, we likewise conclude that the City cannot be subject to municipal liability." (citing *Watkins*, 273 F.3d at 687)); *Green v. City of Southfield*, 759 F. App'x

410, 413 (6th Cir. 2018) ("Because we find that [Plaintiff's] constitutional claims against the individual defendants are untimely, Count II, which was lodged against the City of Southfield, must be dismissed." (citing *Watkins*, 273 F.3d at 687)); *Ford v. County of Grand Traverse*, 535 F.3d 483, 491 (6th Cir. 2008) ("[T]he verdict form should not have been structured in a way that permitted the jury to make findings relating to the liability of the municipality before, and entirely independent of, the findings regarding the individual officials."); *Startzell*, 533 F.3d at 204 (""[F]or there to be municipal liability, there . . . must be a violation of the [Appellants'] constitutional rights.' Because we have found that there was no violation of Appellants' constitutional rights, we need not reach the claim against the City under *Monell.* It too was properly dismissed." (quotation omitted)); *but see Winkler v. Madison County*, 893 F.3d 877 (6th Cir. 2018) (stating, in dicta, that "[a] municipality also may be liable even when the individual government actor is exonerated, including where municipal liability is based on the actions of individual government actors other than those who are named as parties").

Plaintiffs do not appear to contest Johnson City's assertion. Throughout this case, they have staked their cause on the constitutionality of the officers' actions and have not addressed the viability of their municipal liability claim as a free-standing claim—that is, a claim without an underlying constitutional violation to back it. The Court will therefore adhere to the "well settled" view that a municipality cannot be liable under § 1983 absent a constitutional violation, *Wheeler v. Graves County*, No. 5:17-CV-38-TBR, 2019 WL 1320506, at *8 (W.D. Ky. Mar. 22, 2019), and because Plaintiffs have not established that they suffered an infringement of their constitutional rights, their municipal liability claim cannot survive as a free-standing claim. But even so, the Court will go on to address this claim on the merits.

Although a municipality cannot be liable under a theory of respondeat superior, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986), it "may be liable . . . if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation," *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting 42 U.S.C. § 1983) (citing *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978) (Powell, J., concurring))). In other words, "the plaintiff must establish that: (1) the plaintiff's harm was caused by a constitutional violation; and (2) the city was responsible for that violation." *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009) (citation omitted); *see Miller v. Sanilac County*, 606 F.3d 240, 254–55 (6th Cir. 2010) ("To succeed on a municipal liability claim, a plaintiff must establish that his or her constitutional rights were violated and that a policy or custom of the municipality was the 'moving force' behind the deprivation of the plaintiff's rights.").[9]

When an official municipal policy or custom causes a person to suffer a constitutional violation, that policy or custom will create liability against the municipality under § 1983. *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997). A plaintiff may contend that he suffered this type of constitutional deprivation in one of four ways, based on "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Spears*, 589 F.3d at 256 (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).[10] Plaintiffs do not chart their path along the first avenue—they do not challenge the Special Event Policy itself as

---

[9] Plaintiffs characterize Johnson City's Special Event Policy as "the moving force behind the violation of Plaintiffs' rights to freedom of speech." [Am. Compl. ¶ 150].

[10] Although these four avenues for municipal liability perhaps tend to arise most frequently in cases involving inadequate medical care under the Eighth Amendment or excessive force under the Fourth Amendment, they apply with equal force to cases involving free speech under the First Amendment. *See Bible Believers*, 805 F.3d at 260–61 (applying the first and second avenues to the plaintiffs' claim of municipal liability, under which the underlying constitutional violation dealt with the Free Speech Clause).

unconstitutional or challenge conduct that led to the Special Event Policy's implementation. Rather, they claim that the Special Event Policy is unconstitutional in the way that the officers, due to a lack of training, enforced it during the TriPride festival. [Am. Compl. ¶¶ 3–4, 162– 166]; *see* [*id.* ¶ 111 ("In his position of deployment on September 15, 2018, Capitan [sic] Brian Rice had supervisory decision-making authority on the scene for the City."); Pls.' Resp. at 24 ("[T]he City failed to train its officers, and such failure to train violates Plaintiffs' constitutional rights.")].

Plaintiffs' municipal lability claim fails on the merits. As the Court has made clear up to this point, the record simply contains no evidence showing that Captain Rice, as an officer with final decision-making authority, or any other officer acted in violation of Plaintiffs' right to free speech. And under Plaintiffs' failure-to-train theory, the record lacks any evidence showing that Johnson City was deliberately indifferent to a need to train its officers so as to prevent the infringement of free-speech rights—a necessary showing. *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006); *see* [Am. Compl. ¶ 154 ("The City's actions and omissions regarding the failure to adequately train officials, agents, and employees so as to prevent the constitutional violations alleged herein exhibit deliberate indifference toward Plaintiffs' rights to freedom of speech[.]")]. Deliberate indifference "is a stringent standard of fault," requiring proof that a municipal policy-maker disregarded a known or obvious risk of a constitutional violation. *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997) (quoting *Bryan Cty.*, 520 U.S. at 410); *see Pembaur*, 475 U.S. at 483–84 ("[M]unicipal liability . . . attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." (citation omitted)).

35

A plaintiff can show that inadequate training is the product of deliberate indifference in "one of two ways." *Shadrick v. Hopkins County*, 805 F.3d 724, 738 (6th Cir. 2015). First, he can establish that the municipality's officers engaged in a pattern of comparable constitutional violations. Or, alternatively, he can establish deliberate indifference with evidence of "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential" for a constitutional violation. *Id.* at 738–39 (quoting *Bryan Cty.*, 520 U.S. at 409).

A showing of a pattern of similar misconduct—the first of the two approaches—is the "ordinar[y]" way for a plaintiff to establish an inadequate-training theory. *Connick*, 563 U.S. at 62. This is so because repetitive wrongdoing by officers who exercise their discretion is a sure sign that those officers require additional training, and it should be "plainly obvious to the city policymakers." *Bryan Cty.*, 520 U.S. at 407 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1978)). The record here, however, contains no evidence at all of a pattern of constitutional violations, much less a pattern comparable to free-speech violations.[11]

The Supreme Court, however, has acknowledged "the possibility," "in a narrow range of circumstances," *Connick*, 563 U.S. at 63 (quoting *id.* at 409), that a municipal policy-maker's deliberate indifference "could" arise without a pattern of prior constitutional misconduct, *Bryan Cty.*, 520 U.S. at 409. This is where the second of the two approaches has its application. The Supreme Court has confined this second approach to cases in which there is (1) a "likelihood that [a] situation will recur" (2) with such a "high degree of predictability" that "an officer

---

[11] While Plaintiffs do allege a "pattern and practice of violating Plaintiffs' constitutional rights," [Am. Compl. at 8], their unverified allegations, again, are not evidence, *Lopez*, 2018 WL 4689472 at *1 n.1; *Otworth*, 2013 WL 70096328 at *2, and in their motion for summary judgment, they do not raise the argument that the officers engaged in a pattern of prior misconduct. In fact, Mr. Waldrop testified that at a previous event called "the Blue Plum" in 2019, officers did not threaten him with arrest while he was preaching. [Waldrop Dep. at 40:6–9].

36

lacking specific tools to handle that situation will violate citizens' rights." *Id.* at 409–10. To flesh out this type of situation, the Supreme Court provided the hypothetical of a municipality that arms its officers and then mobilizes them into the public to capture absconding felons without training them to use proper force. *Canton*, 489 U.S. at 390 n.10; *Connick*, 563 U.S. at 63–64. "Given the *known frequency* with which police attempt to arrest fleeing felons and the '*predictability*' that an officer lacking specific tools to handle that situation will violate citizens' rights," the consequences of the municipality's failure to train the officers "could be so patently obvious" that the municipality could be liable without a pattern of previous violations. *Connick*, 563 U.S. at 63–64 (emphasis added) (quotation omitted).

Plaintiffs' failure-to-train theory and the facts of this case are, clearly, far afield from the Supreme Court's hypothetical. The evidence shows that the TriPride festival—an inaugural event, *see* [Chief Turner Decl. ¶ 6; First Captain Rice Dep., Doc. 90-6, at 92:4–5]—was anything but a highly predictable situation. By every appearance, it presented Johnson City and its law enforcement officers with an unprecedented set of circumstances and logistical entanglements— from the crowd size to the FBI's involvement, and so on. *See* [First Captain Rice Dep., Doc. 90-6, at 92:4–5 ("[H]aving never dealt with a situation like this, we didn't know what to do[.]"). Nothing in the record even suggests that Johnson City failed to train its officers in a way that could lead to "patently obvious" consequences for citizens' free-speech rights at the TriPride festival—and Plaintiffs themselves do not even go so far as to say so. *Connick*, 563 U.S. at 63– 64. Their municipal liability claim is unworkable, and Johnson City is entitled to summary judgment.

## IV.  CONCLUSION

As a cross movant for summary judgment, Johnson City meets its burden of establishing that it is entitled to summary judgment, whereas Plaintiffs do not. The Court therefore **ORDERS** as follows:

1. Plaintiffs' Motion for Preliminary Injunction [Doc. 38] is **DENIED**.

2. Plaintiffs' Motion for Summary Judgment [Doc. 89] is **DENIED**.

3. Johnson City's Motion for Summary Judgment [Doc. 86] is **GRANTED**.

4. Plaintiffs' Motion to Strike Evidence [Doc. 100] is **GRANTED**.[12]

5. All other outstanding motions are **DENIED as moot**.

6. The Clerk of Court is **DIRECTED** to close this case.

The Court will enter an order consistent with this opinion.

ENTER:

_____
                                        s/J. RONNIE GREER
                        UNITED STATES DISTRICT JUDGE

---

[12] The Court has not considered Captain Rice's declaration [Doc. 87-19] in this opinion.