UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| JEREMIAH WALDROP *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 2:19-CV-00103-JRG-CRW |
| ) | |
| CITY OF JOHNSON CITY, TENNESSEE, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on remand from the United States Court of Appeals for the Sixth Circuit. On November 30, 2020, this Court ruled on the parties' cross motions for summary judgment and entered judgment for Defendant Johnson City, Tennessee, determining that its police officers did not violate Plaintiffs' First Amendment right to free speech during the TriPride Festival in 2018. [Mem. Op. & Order, Doc. 113, at 7–32]. As the Sixth Circuit noted in its order, this Court concluded that "the officers' conduct," i.e., their removal of Plaintiffs from Founders Park, "was a permissible, content-neutral restriction" of speech because Plaintiffs were blocking the entrance. [Sixth Circuit Order, Doc. 124, at 3]. On appeal, Plaintiffs argued that this Court erred because Johnson City, in its motion for summary judgment, did not expressly rely on the record evidence showing that Plaintiffs were blocking the entrance, though Johnson City had filed this evidence in support of its motion for summary judgment. Plaintiffs insisted that this Court abused its discretion because it sua sponte raised this evidence.

"[S]*ua sponte* entry of judgment is 'disfavored,'" but "the practice is not prohibited *per se*," and "a decision in the moving party's favor, even if on an alternative basis than those argued before the court, is a less extreme *sua sponte* action, because the moving party's motion

puts its opponent on at least some notice that defensive action is required." *Turcar, LLC v. IRS*, 451 F. App'x 509, 513 (6th Cir. 2011) (quotation and citations omitted). In this case, the parties strenuously contested the issue of whether the officers' conduct constituted a content-neutral or content-based restriction of speech, and they introduced evidence on this issue for the Court's consideration, including Johnson City's evidence that Plaintiffs were blocking the entrance. In addition, the parties engaged in *two* rounds of briefing in pursuit of summary judgment, and they also presented argument at a hearing that the Court held on Plaintiffs' motion for a preliminary injunction.

In a case like this one, in which the parties have fully briefed an issue and had adequate time to do so, the Sixth Circuit has never held a district court abuses its discretion by relying on relevant evidence that the parties place in the record on that issue.[1] Even so, Johnson City agreed

---

[1] *See Sumner v. Armstrong Coal Co.*, 533 F. App'x 583, 588–89 (6th Cir. 2013) (holding that the district court abused its discretion by sua sponte granting summary judgment against the plaintiff before he had any chance to conduct in discovery); *Advanced Concrete Tools, Inc. v. Beach*, 525 F. App'x 317, 320 (6th Cir. 2013) (holding that the district court abused its discretion when it granted summary judgment on the issue of contractual liability because the parties moved for summary judgment only on the issue damages and "the evidence submitted pertained to the calculation of damages"); *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 829–32 (6th Cir. 2013) (holding that the district court abused its discretion when the parties moved for summary judgment solely on "collateral estoppel grounds" but the district court, after "further factual development of Plaintiff's claims through discovery was put on hold in anticipation of [its] decision on collateral estoppel," sua sponte granted summary judgment on other grounds); *Excel Energy, Inc. v. Cannelton Sales Co.*, 246 F. App'x 953, 958, 962 (6th Cir. 2007) (holding that the district court abused its discretion when it granted summary judgment on all of the plaintiff's claims but without addressing one of those claims); *Shelby Cty. Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Tr. Fund*, 203 F.3d 926, 932 (6th Cir. 2000) (holding that the district court abused its discretion by sua sponte granting summary judgment to "a nonmoving party," whose adversary had no "notice that it had to come forward with all of its evidence"); *GBJ Corp. v. E. Ohio Paving Co.*, 139 F.3d 1080, 1089 (6th Cir. 1998) (holding that the district court abused its discretion by sua sponte granting summary judgment on all counts even though the movant's "memorandum did not make any argument as to why the second count should be dismissed"); *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 104 (6th Cir. 1995) (holding that the district court abused its discretion by sua sponte granting summary judgment for a party that "never filed a motion for summary judgment"); *Beaty v. United States*, 937 F.2d 288, 291 (6th Cir. 1991) (holding that the district court abused its discretion by sua sponte granting summary judgment based on a statute that the parties never raised—a statute that was "not important to th[e] case" and "simply d[id] not apply"); *Routman v. Automatic Data Processing, Inc.*, 873 F.2d 970, 971–72 (6th Cir. 1989) (holding that the district court abused its discretion when it limited the subject of the plaintiff's motion for summary judgment, as well as the scope of discovery, but then sua sponte granted judgment for the defendant on the very issues it had forbidden the plaintiff to pursue); *Yashon v. Gregory*, 737 F.2d 547, 552–53 (6th Cir. 1984) (holding that the district court abused its discretion by sua sponte granting summary judgment to a party who never moved for it while simultaneously denying the opposing party's motion for a continuance under Federal Rule of Civil Procedure 56(f)); *Harrington v. Vandalia-Butler Bd. of Educ.*, 649 F.2d 434, 435–37 (6th Cir. 1981) (holding that the district court abused its discretion by sua

with Plaintiffs' contention that this Court abused its discretion, so the Sixth Circuit summarily remanded this case. This Court must now consider anew the parties' cross motions for summary judgment, but in doing so, it will simply have to ignore the record evidence showing that the officers removed Plaintiffs from the festival's main grounds because they were blocking the entrance.

## I. BACKGROUND

In 2018, Johnson City granted TriPrideTN, Inc., a special-event permit under its Special Event Policy, authorizing TriPride to hold its inaugural parade and festival in downtown Johnson City. [Joint Undisputed Facts, Doc. 78, ¶¶ 1–4, 9–12; Keenan Dep., Doc. 87-6, at 27:19–21; *see* Chief Turner Decl., Doc. 87-3, ¶ 6; First Captain Rice Dep., Doc. 90-6, at 92:4–5]. The parade and festival's purpose was to promote the inclusion of the Lesbian, Gay, Bisexual, Transgender, and Queer or Questioning community. [Lyon Dep., Doc. 87-5, at 176:24–25, 177:1]. Johnson City's Special Event Policy states, in part, that "[i]t is the goal of the Special Event Review Committee to assist event organizers in planning safe and successful events that create a minimal impact on the communities surrounding the events." [Joint Undisputed Facts ¶ 4]. The Special Event Review Committee consists of various local officials, including law enforcement officers, fire-prevention officers, traffic engineers, public works specialists, and city attorneys. [Keenan Dep. at 108:1–6; Sergeant Tallmadge Dep., Doc. 87-15, at 66:8–22].

The Johnson City Police Department was in charge of security for TriPride's parade and festival. [Chief Turner Decl. ¶ 5; Sergeant Tallmadge Decl., Doc. 87-2, ¶ 4]. Although the parade and festival were free of charge and open to any member of the public who passed through a

---

sponte converting a letter to a motion for summary judgment and granting summary judgment without first notifying the parties); *Kistner v. Califano*, 579 F.2d 1004, 1005 (6th Cir. 1978) (holding that the district court abused its discretion by entering summary judgment when "neither party filed a motion for summary judgment").

security checkpoint, [Joint Undisputed Facts ¶¶ 15–19], the Special Event Review Committee decided to allow TriPride to "control who could enter the Festival," [Chief Turner Decl. ¶ 9], after the Johnson City Police Department had learned of credible threats against TriPride, [*id.* ¶¶ 4–8; Second Captain Rice Dep., Doc. 90-9, at 19:11–18].[2] In an effort to mitigate these threats, the Johnson City Police Department worked with the Federal Bureau of Investigation and the Tennessee Bureau of Investigation. [Chief Turner Decl. ¶ 5]. The Johnson City Police Department also erected a designated "protest area," though it was located outside the festival's event area, in the hope that protestors would use that area. [First Captain Rice Dep. at 92:2–17; Joint Undisputed Facts ¶ 21]. In addition, the Special Event Review Committee authorized street closures for the parade, which took place on September 15, 2018, [Joint Undisputed Facts ¶¶ 2, 9, 15–19], with a combined law-enforcement presence of more than two hundred officers and agents from the Johnson City Police Department, the TBI, and the FBI, [Chief Turner Decl. ¶ 5].

On that day, the festival began once the parade ended and was held in Founders Park, "a City park owned and operated by Johnson City." [Joint Undisputed Facts ¶¶ 13, 18–19, 27]. The "event area" for the festival, however, included not only Founders Park but also the peripheral public sidewalks and streets surrounding the park. [*Id.* ¶¶ 18–19, 27]. The festival drew about 10,000 people, [Lyon Dep., Doc. 97-2, at 222:22–24], and as it was underway, Plaintiff Phillip Self entered Founders Park, where he spoke to festival goers in the "amphitheater area" and distributed religious materials to them without incident. [Self Dep., Doc. 98-8, at 50:9; Joint Undisputed Facts ¶ 25]. Mr. Self's companion, Plaintiff Jeremiah Waldrop, who often preaches

---

[2] The Johnson City Police Department had become aware that officials in Knoxville, Tennessee, in response to similar threats, had previously allowed organizers of a gay-pride parade in Knoxville to control access to their parade. [Chief Turner Decl. ¶¶ 6–8]. In granting control to the organizers, the City of Knoxville obtained favorable results in preventing the threats of violence from coming to fruition. [*Id.* ¶ 8].

4

on street corners and at festivals, [Joint Undisputed Facts ¶ 22; Waldrop Dep., Doc. 87-16, at 29:6–14], started preaching "outside the fence" of Founders Park, not far from a set of railroad tracks, [Waldrop Dep. at 63:14–19; Self Dep. at 50:11–18].

At some point, police officers moved Mr. Self and three of his companions, including Mr. Waldrop, to a nearby sidewalk outside Founders Park. [Video: TriPride Festival (on file with the Court); Self Dep. at 65:20–21; Waldrop Dep. at 89:12–15; First Captain Rice Dep. at 22:19–25, 23:1–9]. After they settled on the sidewalk, they used an amplification system and continued to preach—though their preaching involved the use of slurs and animadversions. [Video: TriPride Festival]. While preaching from the sidewalk, they remained inside the security checkpoint and within the festival's event area—an area that extended to the adjoining street, Commerce Street, which was closed for the festival, [First Captain Rice Dep. at 22:19–25, 23:1–9; Captain Church Dep., Doc. 87-4, at 74:14–25]—and they had interactions and confrontations with festival goers, drawing the presence of police officers, [Video: TriPride Festival; Captain Church Dep. at 74:24–25].

At that point, Plaintiffs captured the attention of a TriPride affiliate, George Chamoun, who insisted that Plaintiffs were bothering the festival goers and urged officers to remove them outright from the festival's event area, [First Captain Rice Dep. at 19:6–12; First Captain Rice Dep., Doc. 87-10, at 21:15–21], but the officers declined to do so, [First Captain Rice Dep., Doc. 90-6, at 19:13–15, 22:1–14; Lyon Dep., Doc. 87-18, at 85:16–19]. In their view, Plaintiffs, from the sidewalk, were not interfering with the events going on in Founders Park or with TriPride's expressive message. [First Captain Rice Dep., Doc. 90-6, at 22:8–14; Church Dep. at 78:7–17]. When Plaintiffs, however, asked one of the officers if they would be arrested if they re-entered Founders Park, the officer said that they would be. [Video: TriPride Festival; Lieutenant Peters

5

Dep., Doc. 87-9, at 40:18–20]. Plaintiffs remained on the sidewalk, where they continued preaching for several hours without re-entering the park. [Church Dep. at 78:18–22; Self Dep., Doc. 98-8, at 66:5–12].

Plaintiffs have now filed suit in this Court against Johnson City under 42 U.S.C § 1983, alleging that Johnson City is municipally liable because its police officers, while acting in their official capacities, violated their rights under the United States Constitution. More specifically, Plaintiffs maintain that the officers infringed their constitutional rights to free speech and free exercise of religion by enforcing Johnson City's Special Event Policy in a way that "forc[ed] [them] to move out of a traditional public forum during Special Events." [Am. Compl., Doc. 72, ¶¶ 163, 180]. In addition to these claims under the First Amendment's Free Speech Clause and Free Exercise Clause, Plaintiffs assert that the officers violated their constitutional rights under the Fourteenth Amendment's Due Process Clause, alleging that they "enforce speech restrictions in an *ad hoc*, arbitrary, and discriminatory manner." [*Id.* ¶ 189]. And lastly, Plaintiffs also allege that the officers violated the Tennessee Religious Freedom Restoration Act, Tennessee Code Annotated § 4-1-407. [*Id.* ¶¶ 197–212].

In bringing these claims, Plaintiffs also moved for a preliminary injunction, to enjoin Johnson City from enforcing its Special Event Policy. [Pls.' Mot. Prelim. Inj., Doc. 38]. In response to Plaintiffs' motion for a preliminary injunction, the Court held a hearing, after which it provided the parties with notice of its intent, under Federal Rule of Civil Procedure 65(a)(2), to advance and consolidate the trial on the merits with the hearing, though it first permitted the parties to engage in limited discovery. [Order, Doc. 48, at 1–3]. Having completed discovery, the parties have now filed cross motions for summary judgment, which the Court has carefully considered and is prepared to address.

## II. Legal Standard

Summary judgment is proper when the moving party shows, or "point[s] out to the district court," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), that the record—the admissions, affidavits, answers to interrogatories, declarations, depositions, or other materials—is without a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a), (c). The moving party has the initial burden of identifying the basis for summary judgment and the portions of the record that lack genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party discharges that burden by showing "an absence of evidence to support the nonmoving party's" claim or defense, *id.* at 325, at which point the nonmoving party, to survive summary judgment, must identify facts in the record that create a genuine issue of material fact, *id.* at 324.

Not just any factual dispute will defeat a motion for summary judgment—the requirement is "that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the case under the applicable substantive law, *id.*, and an issue is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In short, the inquiry is whether the record contains evidence that "presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. When ruling on a motion for summary judgment, a court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A court may also

7

resolve pure questions of law on a motion for summary judgment. *See Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 550 (6th Cir. 2015).

### III. ANALYSIS

In agreeing that the Court erroneously relied on the evidence showing that the officers moved Plaintiffs away from Founders Park because they were blocking the entrance, the parties, by implication if not by extension, also seem to agree that this evidence is either not relevant to their dispute or that the Court misconstrued the timeline relevant to their dispute. On appeal, for instance, Plaintiffs contended that their removal from the entrance is "an incident that took place *after* [they] were removed from the park," and "[a]t that point in time [they] had already been removed from the park." In this vein, they also argued on appeal that they had, before this Court, "clearly challenged their removal from Founders Park."

Yet, the lion's share of the parties' evidence before this Court—in fact, the Court might even venture to say *all* of the parties' evidence—deals only with Plaintiffs' interactions with the officers during a specific timeline: the time of Plaintiffs' removal from the entrance to the time that Plaintiffs spent preaching on the sidewalk after their removal from the entrance. In other words, the evidence concerns only events that took place *outside* Founders Park, but within the festival's footprint. For example, the video that Johnson City submitted to the Court—and that Johnson City cited several times in its legal memorandum—captures Plaintiffs while preaching on the sidewalk outside Founders Park with officers nearby. Johnson City insisted the video was so relevant to this case that the Court could "ignore[]" Plaintiffs' allegations to the extent they conflicted with the video. [Def.'s Mem., Doc. 87, at 1]. Similarly, Johnson City represented to the Court that the "facts that are on videotape . . . are going to . . . dictate and control the ultimate dispositive outcome of this case." [Hr'g Tr., Doc. 68, 21:18–20].

8

And Plaintiffs, in lockstep, homed in exclusively on evidence dealing with the parties' interactions outside Founders Park. For example, in their memorandum, they complained that Lieutenant Peters threatened them with arrest, [Pls.' Mem., Doc. 91, at 9], but his threat occurred outside the park, *see* [Lieutenant Peters Dep. at 40:24–25, 41:1–8 (stating that Plaintiffs "were already outside" Founders Park when he threatened them with arrest)]. Plaintiffs also asserted that they were not being disruptive while they were preaching and that the officers, by keeping them at bay from the park, must have therefore been aiming to stifle the content of their speech. [Pls.' Mem. at 8]. This assertion, by Plaintiffs' own admission, likewise applies to events that arose outside the park: "Captain Church testified that he could have asked Plaintiffs to lower the volume of their amplification if they were being disruptive; however, at no time, while Plaintiffs were located *on the public sidewalk outside Founder's Park*, did Capt. Church request that Plaintiffs lower their volume." [*Id.* (emphasis added)].

So, if the parties' kernel dispute does lie inside Founders Park—and the Court, based on the appeal's outcome, now has the firm impression that they believe it does—then they have at worst misled the Court and at best done an unspeakably poor job of presenting and identifying evidence showing what interactions, if any, took place between Plaintiffs and the officers *inside* the park. Their arguments and evidence consist only of the most oblique references to the goings-on inside Founders Park.

For instance, Plaintiffs, in their legal memorandum, argue the evidence shows that the officers "enforced a request from TriPride to move Plaintiffs from *within* the event area in Founder's Park," [Pls.' Mem. at 4 (emphasis added)], and for support, they cite Johnson City's answer to their twenty-second request for admission, which states.

9

> 22. Admit that City of Johnson City, Tennessee officers acted under color of law when they enforced requests from the organizer of the 2018 Tri-Pride Festival to exclude people from a public park.
>
> Answer: Admitted that Johnson City law enforcement officers were acting under color of law when they responded to requests from the organizer of the 2018 TriPride Festival and moved certain street preachers from an area within the Festival where organized events were taking place, which was in a public park. The plaintiff street preachers shared their expressive message with attendees of the Festival from a sidewalk at the edge of the Festival and within the footprint of the reserved area of the Festival.

[Def.'s Answers to Req. for Admis., Doc. 90-14, at 9–10]. But Johnson City's vague reference to "certain preachers" hardly shows that the officers removed Plaintiffs, specifically, from the park. After all, as Plaintiffs acknowledged on appeal, and as the record here suggests, they were not the only street preachers present at the festival. *See* [First Captain Rice Dep., Doc. 98-1, at 130:7–18; Third Captain Rice Dep., Doc. 87-12, at 58:21–22]. Even when the Court looks to the testimony of Mr. Self, who the record firmly establishes was inside the park at some point during the festival, it finds no genuine evidence of an encounter between him and the officers:

> Q. Did you have any contact, or confrontation, or problem with a TriPride representative while you were inside the park itself?
>
> A. No.
>
> Q. Do you understand my question?
>
> A. Not at the time.
>
> Q. Did you at any time have a confrontation or communication with a TriPride representative during the TriPride festival or parade?
>
> A: I can't remember. I can't remember if I did or not.
>
> Q. So if a TriPride representative said that they had no contact with you, you don't have any evidence or remembrance to contradict that?
>
> A. I do not know.

> Q. Were you asked to leave from the amphitheater area when you were handing out the religious tracts?
>
> A. No.
>
> Q. By either a TriPride representative or a law enforcement officer?
>
> A. Yes.
>
> Q. Yes?
>
> A. Uh huh (Affirmative).
>
> Q. Okay. Tell me about that.
>
> A. I was told not to leave the group to speak with people.
>
> Q. Who told you that?
>
> A. I don't know.
>
> Q. Is it on video? Have you ever seen that on video?
>
> A. I have not.
>
> Q. Was that—so you don't know who the law enforcement officer was?
>
> A. No.
>
> Q. Was there anybody else in close proximity that heard that?
>
> A. I don't know.
>
> Q. Are you aware or has anybody in your group told you that they were told the same thing?
>
> A. I don't remember.
>
> Q. Anything else besides that?
>
> A. Not that I can recall.

[Self. Dep. at 51:6–25, 52:1–19]. Mr. Self's testimony is equivocal, if not baffling.

Johnson City fares no better in identifying any interaction between Plaintiffs and the officers inside Founders Park. In its legal memorandum, it states that an officer first encountered Mr. Waldrop and some of his companions on the periphery of Founders Park not far from the railroad tracks and then that "Plaintiffs' group ended up and preached for several hours on th[e] sidewalk." [Def.'s Mem. at 7–8]. In between recounting Mr. Waldrop's presence by the railroad tracks and Plaintiffs' eventual removal to the sidewalk, Johnson City gives no narration of any interaction that occurred between the officers and Plaintiffs *inside* the park. Johnson City does, however, go on to state that:

> During the Festival, TriPride representatives requested that City officers move the Plaintiffs' group from the main Festival area who were condemning the homosexual community, which is the exact opposite message that TriPride sought to convey. Officers moved certain street preachers to a sidewalk at the edge of Founders Park where they continued preaching for several hours.

[*Id.* at 18]. But Johnson City makes this statement without any citation to record evidence. *See Whitt Mach., Inc. v. Essex Ins. Co.*, 631 F. Supp. 2d 927, 931–32 (S.D. Ohio 2009) (stating that parties pursuing summary judgment "*must* submit evidence in support of any material element of a claim or defense at issue" (emphasis added) (citing *Celotex*, 477 U.S. at 317)). What was the nature of the parties' interaction? What was said, and how was it said? Captain Rice testified that "there was a disturbance . . . in the amphitheater," but she could not "comment accurately" on the type or extent of the disturbance. [First Captain Rice Dep., Doc. 98-1, at 61:3–6].[3] Were Plaintiffs using an amplification system? Were they being disruptive of the festival? The record evidence answers none of these questions.

---

[3] Kenn Lyon, a TriPride affiliate, testified that he encountered a person who was involved in a "heated" but "respectful" conversation with festival goers, but this encounter occurred outside the park "by the main entrance," and Mr. Lyon did not ask for his removal from the festival. [Lyon Dep., Doc. 90-10, at 195:1–18].

12

In sum, is all of this enough to create a genuine issue of material fact as to whether the officers removed Plaintiffs from *inside* Founders Park at TriPride's behest and, if so, whether they did so because of the content of Plaintiffs' speech? It will have to be, because the Court has already allowed the parties to engage in two rounds of briefing, and it is not going to devote its limited resources to reviewing a third round of briefing when the parties, now over two years into the case, have thoroughly and inexplicably failed to come forward with evidence on the salient issue. The Court will convene a jury to find out what happened between the parties, if anything, inside Founders Park.

Lastly, the Court would be remiss if it did not address Johnson City's latest filing, a supplemental brief [Doc. 125] under Local Rule 7.1(d).[4] In the supplemental brief, Johnson City appears to contend that this case is now moot because a real, live controversy no longer exists. According to Johnson City, it has adopted a new "policy regarding First Amendment activities in a public forum," and this policy became effective on August 10, 2021. [*Id*. at 1]. "Johnson City's position is that this policy, which will apply to any future public event, complies with the First Amendment. Therefore, there is no basis for the issuance of a Preliminary Injunction." [*Id.* at 2].

Article III of the United States Constitution gives federal courts authority to adjudicate *actual* "Cases" or "Controversies." U.S. Const. art. III, § 2; *see Ky. Right to Life, Inc. v. Terry*, 108 F.3d 637, 644 (6th Cir. 1997). The mootness doctrine originates from this language in Article III, which comprises the venerable case-or-controversy requirement. *Burke v. Barnes*, 479 U.S.

---

[4] Local Rule 7.1(d) states: "No additional briefs, affidavits, or other papers in support of or in opposition to a motion shall be filed without prior approval of the Court, except that a party may file a supplemental brief of no more than 5 pages to call to the Court's attention developments occurring after a party's final brief is filed. Any response to a supplemental brief shall be filed within 7 days after service of the supplemental brief and shall be limited to no more than 5 pages."

361, 363 (1987). In plain terms, mootness means that if an actual, ongoing controversy ceases to exist between the parties at *any* point in the litigation, the case cannot continue. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997); *Pettrey v. Enter. Title Agency, Inc.*, 584 F.3d 701, 703 (6th Cir. 2009); *Carras v. Williams*, 807 F.2d 1286, 1289 (6th Cir. 1986).

In determining whether a case has become moot, a court will examine any "intervening circumstances" that have arisen during the case's pendency, *WJW-TV, Inc. v. City of Cleveland*, 878 F.2d 906, 909 (6th Cir. 1989) (quotation omitted), and decide whether they "render the court unable to grant the requested relief," *Carras v. Williams*, 807 F.2d 1286, 1289 (6th Cir. 1986) (citing *S. Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 514 (1911)); *see Envtl. Def. Fund, Inc. v. Gorsuch*, 713 F.2d 802, 820 (D.C. Cir. 1983) (stating that "mootness issues arise most often when circumstances change during the course of the litigation so that granting the requested relief will not serve any purpose"). In any given case, intervening circumstances may take one of three forms: (1) the plaintiff abandons or settles the case, (2) the defendant voluntarily ceases the alleged illegal conduct, or (3) events beyond either party's control cause relief to become impossible or unnecessary. *Envtl. Def. Fund*, 713 F.2d at 820.

The second intervening circumstance—a defendant's voluntary cessation of the alleged illegal conduct—does not, as a general rule, automatically moot a case. *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979). Instead, courts must determine (1) whether the defendant's cessation of the alleged illegal conduct has completely and irrevocably eliminated the effects of that conduct and (2) whether the record supports a reasonable expectation that the alleged illegal conduct will not happen again. *Id*. Some federal courts have referred to this two-pronged test as the "*Davis* test," *Doe v. Harris*, 696 F.2d 109, 111 (D.C. Cir. 1982); *Finberg v. Sullivan*, 658 F.2d 93, 98 (3d Cir. 1980), though others have more recently referred to it as the "voluntary

14

Case 2:19-cv-00103-JRG-CRW   Document 129   Filed 01/26/22   Page 14 of 18   PageID #: 1953

cessation test," *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 93 (2013). When a defendant "claims that its voluntary cessation of the challenged activity moots a case," as is the case here, "it bears the burden of proving mootness." *Sherwood v. Tenn. Valley Auth.*, 842 F.3d 400, 405 (6th Cir. 2016) (citation omitted).

To discharge this burden, a governmental entity—consisting of public servants instead of self-interested private parties—has a less laborious undertaking in pursuit of mootness than a private entity does. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019). Whether legislative or non-legislative, a governmental entity that voluntary ceases its allegedly illegal conduct is entitled to a good-faith presumption that the conduct is "unlikely to recur," *id.* at 767–68, so long as it "appears genuine," *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 981 (6th Cir. 2012) (quotation omitted); *see Speech First*, 939 F.3d at 768 ("[G]overnment action receives this solicitude because courts assume 'that [the government] acts in good faith'" (quotation omitted)); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009) ("[G]overnment actors in the sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they are public servants, not self-interested private parties."). A determination of exactly how much solicitude that a governmental entity is entitled to, however, varies with the facts of the case and must "take[] into account the totality of the circumstances surrounding the voluntary cessation." *Id.*

First, Johnson City must demonstrate that its new policy is "'sufficiently altered so as to present a substantially different controversy," *Hill v. Snyder*, 878 F.3d 193, 204 (6th Cir. 2017) (quotation omitted), and does not differ from the original policy merely "in some insignificant respect," *Ne. Fla. Chapter of Associated Gen. Contractors*, 508 U.S. at 662. After all, as a fact-specific inquiry under the totality of the circumstances would suggest, not *every* case becomes

15

moot by a simple alteration in the law or policy at issue. *Cam I, Inc v. Louisville/Jefferson Cty. Metro. Gov't*, 460 F.3d 717, 720 (6th Cir. 2006). "[I]f that were the rule, a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993). Johnson City does not make any appreciable showing that its new policy differs significantly from its original policy; instead, it states in conclusory fashion that its new policy "complies with current law from the United States Supreme Court and the Sixth Circuit Court of Appeals," [Pls.' Suppl. Br. at 1], without explaining how it complies with current law, *see McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (quotation omitted)).

Second, the timing of the new policy's enactment is another issue that Johnson City must address under the totality of the circumstances, because it weighs on whether its disengagement from the alleged illegal conduct is genuine. *Speech First*, 939 F.3d at 769–70; *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 342–43 (6th Cir. 2007). Johnson City fails to address the timing of the enactment of its new policy, apart from noting that it enacted the new policy on August 10, 2021, at which time this case was on an appeal. Johnson City's decision to enact its new policy while this case remained mired in active litigation only increases its burden of illustrating mootness, even as a governmental entity. *See Speech First*, 939 F.3d at 769 ("The timing of the [public] University's change [in its policy] also raises suspicions that its cessation is not genuine. The University removed the definitions after the complaint was filed. If anything, this increases the University's burden to prove that its change is genuine." (citations omitted)); *Northland Family Planning Clinic*, 487 F.3d at 342–43 ("In this case, that burden is increased by

16

the fact that the voluntary cessation only appears to have occurred in response to the present litigation, which shows a greater likelihood that it could be resumed." (citation omitted)). The obvious inference from the timing of Johnson City's enactment of its new policy is that it altered its original policy in response to the ongoing litigation. As the party with the burden of showing mootness, Johnson City musters no viable argument or evidence to dissuade the Court from drawing this inference. *See Speech First*, 939 F.3d at 769–70 (citing a lack of evidence and ineffective argumentation as grounds for rejecting the university's reason for waiting to enact a new policy until litigation had begun).

Finally, although a defendant's express disavowal of the alleged illegal conduct is not a prerequisite to establishing mootness, *Bench Billboard*, 675 F.3d at 982; *Irwin v. Tenn. Valley Auth.*, No. 3:12-cv-35, 2013 WL 3968553, at *3 (E.D. Tenn. July 31, 2013), the Court—under the totality of the circumstances—does consider any efforts on the defendant's part, in the face of litigation, to "vigorously defend[] the constitutionality of its [laws]," *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007); *see Speech First*, 939 F.3d at 770 ("Significantly, the University continues to defend its use of the challenged definitions. Although not dispositive, the Supreme Court has found whether a government entity 'vigorously defends the constitutionality of its . . . program' important to the mootness inquiry." (quoting *Parents Involved in Cmty. Schs.*, 551 U.S. at 719)). From this case's inception through the recent appeal, Johnson City has vigorously defended the constitutionality of its policy, insistent that its officers' conduct was lawful, and its insistence bodes against a finding of mootness. *See Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) ("[H]ere, since the union continues to defend the legality of the Political Fight-Back fee, it is not clear why the union

would necessarily refrain from collecting similar fees in the future."). In sum, Johnson City, in its supplemental brief, fails to meet its burden of establishing this case is moot.

## IV. CONCLUSION

A genuine issue of material fact exists as to whether the officers removed Plaintiffs from Founders Park, and if so, whether they did so for a content-neutral or content-based reason. This case is therefore set for trial on <u>Tuesday, May 10, 2022, at 9:00</u>, at the James H. Quillen United States Courthouse in Greeneville, Tennessee. The Court will reserve ruling on the legal issues in the parties' motions for summary judgment and on Plaintiffs' motion for a preliminary injunction until after trial. The Court will enter an amended scheduling order.

So ordered.

ENTER:

s/J. RONNIE GREER  
UNITED STATES DISTRICT JUDGE